**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SLIM MANAI, F-98219,

        Petitioner,

    v.

ELVIN VALENZUELA,[1] Acting Warden,

        Respondent.
_____/

No. C 12-4399 CRB

**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS**

      Petitioner, a state prisoner incarcerated at California's Men's Colony East, San Luis Obispo, has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging a conviction from San Francisco County Superior Court.  For the reasons that follow, the petition will be denied.

**I.     STATEMENT OF THE CASE**

      On February 2, 2007, a jury convicted Petitioner of committing the following offenses, committed on March 3, 2006 against two victims: first degree residential burglary, forcible oral copulation, sexual battery, assault with a deadly weapon, and criminal threats. The jury also found, under California's One Strike law, that Petitioner committed each count of forcible oral copulation during a burglary and that, for the purpose of weapons

_____

[1] Elvin Valenzuela succeeded Mathew Cates as Warden at California Men's Colony State Prison, San Luis Obispo and is therefore substituted as the respondent in this action.  See 28 U.S.C. § 2243 ("The writ [of habeas corpus] . . . shall be directed to the person having custody of the person detained.")

United States District Court
For the Northern District of California

enhancements provided under California Penal Code sections 12022 and 12022.3, Petitioner committed the burglary, threats, forcible oral copulation, and sexual battery using a deadly and dangerous weapon. On November 8, 2007, the court entered judgement and sentenced Petitioner to life in prison with the possibility of parole after 75 years.

In a reasoned opinion issued on November 16, 2010, the California Court of Appeal reduced the felony restitution and parole revocation fines and increased the court security fee, but otherwise affirmed the judgment of the trial court. On February 23, 2011, the California Supreme Court denied review. Petitioner did not pursue state habeas relief.

On August 21, 2012, Petitioner filed a pro se Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254. On February 4, 2013, this Court granted Petitioner's Motion to Appoint Counsel. On December 17, 2013, Petitioner, now represented by counsel, filed the instant First Amended Petition for Writ of Habeas Corpus. This Court found the claims in the petition cognizable under § 2254 and, on February 21, 2013, ordered Respondent to show cause why a writ of habeas corpus should not be granted. Respondent filed an Answer to the Petition for Habeas Corpus on October 20, 2014. On December 22, 2014, Petitioner filed a Traverse in support of his First Amended Petition.

## II.    FACTUAL BACKGROUND

The California Court of Appeal summarized the facts of the case as follows:

> Jury selection first began before Judge Miller on October 23, 2006. On October 26, 2006, after a jury was sworn, but before the presentation of evidence, the court declared a mistrial. Jury selection for a retrial began immediately and the presentation of evidence took place in November 2006. On November 14, 2006, another mistrial resulted after the jury was unable to reach a unanimous verdict. Jury selection began for a third time on January 10, 2007, before Judge Cynthia Ming–Mei Lee. The following evidence was presented.
>
> **The Prosecution Case**
>
> On Thursday, March 2, 2006, Suzy and Claudia[2] went to Place Pigalle, a neighborhood bar in San Francisco, arriving at about 10:00 or 10:30 p.m. They socialized with friends at the bar, including Claudia's neighbors Bobby Rivera and Freddy Fuentes. [Petitioner] approached Suzy and introduced himself as Valentine. Suzy testified that she, Claudia, Rivera, and Fuentes decided to go

---

[2] Because of the nature of Petitioner's charged offenses, the state courts did not disclose the last names of the victims. Accordingly, this Court will also refer to the victims only by first name.

to Claudia's apartment to continue to party.  Suzy invited [Petitioner] to come along because she felt sorry for him.

When the five arrived at Claudia's apartment, they drank whiskey and used cocaine, which Rivera and Fuentes had brought with them.  Claudia testified that Suzy, [Petitioner], Rivera, and Fuentes were all intoxicated.  Sometime between 12:30 and 1:00 a.m., Claudia excused herself to go to sleep because she had to work the next day.  About an hour later, Suzy, who planned to stay overnight in Claudia's apartment, said she needed to go to bed because she also needed to work the next day.  Rivera, Fuentes, and [Petitioner] left the apartment together and walked back to the bar.  Rivera invited [Petitioner] to go back to the bar with him and Fuentes, but [Petitioner] said he was going to take a cab home.  Rivera and Fuentes entered the bar at about 1:45 a.m.  When they left the bar at 2:00 a.m., [Petitioner] was gone.

About 10 minutes after the three men had left the apartment, Suzy heard a knock on the door.  She looked out the window and saw [Petitioner] standing outside the door in the rain.  She opened the door and he asked if he had left his cell phone and keys in the apartment.  She saw the phone on a table by the door and turned around to look for the keys.  Because of the rain, she let [Petitioner] inside.

"[I]n a matter of seconds [Petitioner] had his arm around my neck, and the other hand . . . was holding a corkscrew to my neck."  He was pressing "[p]retty hard" and "it was piercing into [her] skin."  [Petitioner] then grabbed her arm and turned her around to face him.  He told her to shut up and not to make any noise if she wanted to live.  Suzy smiled because she thought he was just rough housing in play.  When she asked if he was joking, he hit her at least three times on the top and side of her head.  [Petitioner] was not slurring his words and he did not seem intoxicated.  Suzy also did not feel intoxicated at that point.

[Petitioner] told Suzy to get on her hands and knees and act like a dog.  She looked up at him in shock, and "he had these cold eyes, like he had so much hate in him."  He told her not to look at him.  Suzy got on her hands and knees and [Petitioner] hit her on the top of her head "really hard" three or four times with a closed fist.  She thought she was going to pass out.  [Petitioner] said he was going to get what he wanted and then leave.  He grabbed Suzy by the hair and dragged her to the kitchen as she crawled along with him.  When she said, "'How could you do this?'" he punched her in the head, told her to shut up, ordered her not to look at him, and said she should be "a good doggie."  Also, when she called him "Valentine," he told her not to because it was not his real name.  [Petitioner] told Suzy to suck on his finger "and do it good."  As she did so, she moaned and seemed to be enjoying it.  He then told Suzy to get up and kiss him, which she did.

[Petitioner] said he wanted to go into Claudia's bedroom.  Suzy panicked because "I was afraid she was going to scream or—and I was afraid that he was gonna hurt her."  [Petitioner] told Suzy to shut up and hit her on the head.  He held Suzy with the corkscrew to her neck, went into the bedroom, and told Suzy to get on her hands and knees.  Suzy climbed on the bed and rubbed Claudia's arm to wake her up as [Petitioner] stood next to Claudia.  [Petitioner] then put his hand over Claudia's mouth and held the corkscrew to her neck or temple.  When Claudia woke up and asked what was going on, [Petitioner] told her to shut up, hit her on the head with a closed fist really hard, and told her not to make any noise.  He said he was going to rearrange her face if she fought

3

him, and he was going to get what he wanted and then leave.  [Petitioner] told Claudia to get on her hands and knees and act like a dog.  Claudia got on her hands and knees on the bed next to Suzy.

Claudia testified that when she woke up, she felt a sharp object by her head and saw someone standing to her left.  When she asked, "Who is that?" [Petitioner] punched her "pretty hard" in the mouth and said not to look at him.  She started to get up, but [Petitioner] pushed her back onto the bed and said, "'Do you want your face rearranged?'" [Petitioner] then put his left fingers in her mouth and felt her breasts under her shirt while telling her not to look at him.  Claudia asked, "What are you doing?" and he punched her in the mouth again and told her not to look at him.  Claudia tried to get off the bed and felt [Petitioner] push her to the floor, where she landed on her hands and knees.  [Petitioner] kicked her in the ribs and punched her in the left back.  Suzy said, "Don't hurt her," and [Petitioner] hit Suzy in the face.  Claudia noticed [Petitioner] had a corkscrew in his hand and did not recognize it as something from her household.  [Petitioner] was not slurring his speech or stumbling during the incident.

Claudia testified that they left the bedroom because she told [Petitioner] she had to go to the bathroom.  [Petitioner] grabbed them by their hair, pulling Suzy off the bed, and took them to the bathroom as they crawled along with him.  He kept telling them not to look at him.  In the bathroom, Claudia was not able to relieve herself.  [Petitioner] told both women to take off their clothes.  Claudia had difficulty taking off her shirt, which was a karate top with ties in a knot.

Suzy stripped naked and [Petitioner] made her give him oral sex.  Suzy was delayed by multiple buttons on her shirt and he punched her and told her to hurry up.  When she got all her clothes off, [Petitioner] told her to stand in front of him and he caressed her breasts and moved his hand toward her pubic area while moaning, breathing heavily and saying things like, "Oh, yeah, that's nice." [Petitioner] told her to turn around and he caressed her waist and buttocks, making the same sounds.  [Petitioner] then told her to get on her hands and knees and suck on his penis and "do it good."  Suzy orally copulated [Petitioner] for about one minute while he moaned, said it was good, and called Suzy a "good doggie."  [Petitioner] then told her to stop, and directed Claudia to take her clothes off.  Claudia also had a hard time with her top and [Petitioner] told her to hurry up while continuously punching her in the head.  He told Claudia to suck on his penis, which she did while on her knees next to Suzy, who was also on her knees.  [Petitioner] was breathing very hard while she did so, and he still had his hand in Claudia's hair.  He then pulled Suzy to her feet and told her to kiss him.  Then he moved Claudia toward his penis and made her perform oral sex on him.  At first, Claudia's mouth was so dry that she could not do it and [Petitioner] hit her on the back of the head with a closed fist and told her, "'Do it right.'"  Then she put her mouth on his penis because she was afraid.  She was on her hands and knees on the floor and [Petitioner] was standing and kissing Suzy.

Claudia bit down on [Petitioner's] penis very hard.  He screamed and pulled back, and Claudia stood up and started hitting him as hard as she could, smothering his face with her hands.  She told Suzy to hit [Petitioner] as well because she could not see [Petitioner's] corkscrew.  Suzy tried, but [Petitioner] was pulling her head down by her hair so she couldn't look up.  [Petitioner] was also hitting back and they were all screaming. [Petitioner] said, "'Let me go. I want to leave.'"  They let him go and he fell back in the hallway, hitting

4

his head against the wall, and ran out the front door.  Claudia testified that, while they were fighting, she felt [Petitioner's] hand grab the left side of her hair and slam her head against the wall.  She lost her vision for a second or two because of the blow.  The next thing she remembered, [Petitioner] was in the hallway and he said, "'I leave now,'" as he pulled up his pants.

Claudia slammed shut the door to the bathroom.  Suzy was on the floor, crying hysterically, and Claudia asked her to help move a bathroom dresser to block the bathroom door, which they did.  Suzy noticed her jacket was in the bathroom, so she took a cell phone out of the pocket and called 911.  She made the call about two to five minutes after the incident occurred.  The cell phone recorded that the call was made at 2:03 a.m.

A recording of the 911 call was played for the jury.  Suzy provided the address and told the operator, "A gentleman just tried to rape me and my friend and we fought him and he ran out."  When the operator asked if he had a weapon, she said, "Yes, he had a corkscrew.  He threatened us that he'll kill us with it."  She said they had met the man that night at a bar, he had come over with some of their friends, and he introduced himself as Valentine but later said that was not his real name.  As she provided this information, Suzy repeatedly broke down crying, had trouble breathing, asked the operator, "Can you please hurry up?" and said, "I'm going to die.  Okay.  Okay.  Okay."  Claudia then got on the phone.  She was distraught and asked the operator, "Could you please send the SWAT team or something?"

When told that officers were at the apartment, Claudia and Suzy pushed the dresser from the door and ran down the hallway to the front door.  Claudia testified, "When we opened the door, we started just being hysterical.  Like Suzy fell on the floor screaming and shaking and[ ] . . . I was just shaking.  All I could feel was cold.  And I [was] holding my head, because I had been hurt really bad on the side of my head."  Suzy testified, "I remember the officers were standing up and I was sitting down, and I asked if they could sit next to me, because I had a really hard time with myself being sat down and someone being above me standing, because that was what was going on through most of the assault."

San Francisco police officer Eric Mahoney responded to the 911 call with another officer and arrived at the apartment at about 2:05 a.m.  After knocking for two to three minutes, the door opened and two women came out.  "[O]ne of them grabbed me in a bear hug and the other one grabbed my partner in a bear hug."  The seemed very scared and they were crying and breathing very heavily, as if hyperventilating.  After a few seconds, they went inside and Mahoney tried to separate the women to calm them down and try to find out what happened.  It was difficult because they were clinging to each other and crying.  After about five minutes in the bedroom, he brought Claudia back into the living room and she and Suzy began crying again and hugging each other.  Mahoney did not notice any signs of intoxication in either woman.  They provided an account of the incident and were seen by paramedics.

Mahoney took the women to San Francisco General Hospital's Trauma Recovery Center.  Jessica Thayer, a physician's assistant and trained sexual assault response forensic examiner, examined each of them separately beginning at about 4:00 a.m.  Inspector Sidney Laws of the San Francisco Police Department sexual assault detail was present during the verbal portions of the examinations, which she recorded.  Thayer testified that Suzy was alert and oriented but tearful and upset.  Laws testified that Suzy was "very

emotionally upset." Both testified that Suzy did not appear to be under the influence of alcohol or drugs. Thayer's physical examination of Suzy revealed tenderness to the back of her head, some scratches on her neck, and some redness and tenderness on the back of her right arm. The scratches on her neck were very thin, as if "a sharp object had brushed across the surface of her skin" and seemed fresh. Thayer opined that the injuries were consistent with Suzy's description of the incident. Photographs taken at the hospital on March 3, 2006, showed a scratch right below her neck, a scratch on the side of her neck, and "fingerprint" bruises or marks on her arm.

Thayer and Laws testified that Claudia was very angry and crying when interviewed. She had no visible signs of intoxication. Thayer's physical examination of Claudia revealed some bruising and tenderness on her left temple, tenderness to her right jaw, tenderness to her midline back, redness and tenderness on the back of her right arm, and a small abrasion on her right knee. These injuries were consistent with Claudia's description of the incident. Thayer took photographs of Claudia on March 3 that showed scratches on neck and redness on her arm, but did not show the bruising on her temple or redness on her back. "[O]ften the photographs don't reflect what we see." Also, "bruising can occur over the next several days as the blood leaks out of the damaged vessels." Photographs of Claudia taken on March 6, 2006, showed a bruise, scrape and swelling on her left knee, which Claudia testified was caused by [Petitioner's] dragging her on the floor; bruising on her right knee; a bruise on her back, which she testified was probably caused by [Petitioner's] punching her on the back; a bruise on her rib, which she testified was caused by [Petitioner's] kicking her in the ribs; a cut on her left ring finger, which she testified was probably caused when she hit [Petitioner].

In the interviews with Laws, Claudia and Suzy initially denied using cocaine, but later admitted cocaine use when specifically asked by the inspector. Before Suzy testified at the earlier November 2006 trial, the prosecutor told her that she had no intention of prosecuting her for any drug use she admitted during her testimony. Claudia had not been told that she would not be prosecuted for consuming drugs on March 3, 2006, but the prosecutor told her it was unlikely she would be prosecuted.

Earlier, while at the bar, [Petitioner] gave Suzie his cell phone number, which she entered on her cell phone "[j]ust to be friendly." Suzy and Claudia gave Laws the number. Laws dialed the number, but it went to voice mail. Using a search warrant, Laws determined that the number was registered to Ali Rad. On March 6, 2006, Laws called another number associated with [Petitioner], reached him, and told him she needed to speak to [Petitioner]. Rad agreed to give [Petitioner] her number. Laws called Rad again later in the day and Rad asked if it was about a fight with two girls. About a half hour later, [Petitioner] called and spoke to Laws. At about 6:00 p.m., [Petitioner] came to the police department voluntarily. He was placed under arrest almost immediately and photographs were taken of his penis, which showed bruising.

**Prior Sexual Assault Evidence**

Veronique P. (Veronique) testified that on June 29, 1996, at about 1:00 a.m., she entered her apartment building and was climbing an internal staircase when she realized people were behind her. As she approached her door, someone put his arm around her throat and shoulders, held a knife blade to her neck, and told her to open the door and enter the apartment. She later got a good look at this man, whom she identified in court as [Petitioner].

[Petitioner] and another man, Jouaneix, entered the apartment with Veronique. Soon after entering, they told Veronique to go into one of the bedrooms. [Petitioner] told her, "Watch out or else." At [Petitioner's] direction, Jouaneix searched Veronique's bag, found 600 francs and an ATM card, got Veronique's PIN number, and left to take money from her account.

[Petitioner] told Veronique to lie face down on the bed. He took rope from the apartment, tied her hands behind her back, and put a towel over her head. He then searched through the apartment, put some of her belongings in a bag. He then asked Veronique to suck his penis. She did not respond. He said, "I'm waiting. I'm waiting. I'm waiting," with an increasingly agitated and mean voice, and she said, "I would prefer not." He said, "'[Y]ou are really disappointing me.'" He told her to keep her eyes closed and then grabbed her by the clothing near her neck and shoulder. She fell to the floor and he dragged her until she was able to get onto her feet and then pulled her into the living room and over to the sofa. [Petitioner] sat on the sofa, told Veronique to get on her knees, pulled down his clothes, and pulled her face toward his penis. As she orally copulated him, [Petitioner] said her performance was not that great and he told her to swallow his semen. After he ejaculated, Veronique spit out his semen and [Petitioner] said, "Careful. Do what I say." [Petitioner] took Veronique back to the bedroom, had her lie face down on the bed again, and put the towel back over her head as he continued to search her room.

He then took her back to the living room, sat down, pulled down his clothes, got Veronique on her knees, and pulled her head toward his penis. While she orally copulated him, he said, "Don't do what you did last time. This time, you better swallow my sperm," and she did what he asked. He unbuttoned Veronique's shirt and moaned while he fondled her breasts. [Petitioner] then stood up, turned his back toward Veronique, and told her to lick his anus, which she did. He said her performance was not all that great and he said French women really did not know how to do that. He got dressed and took her back to the bedroom, putting the towel over her head again.

When Jouaneix returned, [Petitioner] gagged Veronique, tightened the rope around her hands, and tied up her feet. He told her, "I'm not worried about you. I assume you have got insurance. In any case, it's not in your best interest to lodge a complaint. And even if you file charges, I'll be out in five years. And if you do that, I will find you and—and if I am not the one who finds you, something will happen to somebody in your family." She felt terrorized. After they left, Veronique was able to get her feet free from the rope, open the front door with her teeth, and went for help.

**The Defense Case**

[Petitioner] testified that he arrived in San Francisco on February 10, 2006, for a one-month visit. [Petitioner] said that he went to a bar on March 2, 2006, with Ali, a Frenchman he met two or three days after arriving in San Francisco, and that he drank two small beers. [Petitioner] and his friends then went to Place Pigalle, where [Petitioner] had a glass of wine and a small beer. At Place Pigalle, [Petitioner] said that he started talking to Suzy, and "[v]ery quickly, there was great feeling between [them]." At one point, he went outside to smoke a cigarette and saw Suzy, Claudia, and a couple of their male friends. The men asked if [Petitioner] wanted to go with them to Claudia's apartment, but Claudia said "No. No." The men pulled Claudia along and waved to [Petitioner] to come along, and Suzy took Manai by the hand. "I didn't want to

7

go, because Claudia didn't want me to. But Suzy insisted, and so in the end I went with them."

At Claudia's apartment, the others played music, put cocaine on a table, and started rolling joints of marijuana. [Petitioner] said that he tried cocaine for the first time, but did not feel any effect. [Petitioner] claimed that Suzy was dancing in a very sexy manner and turning her buttocks toward him, and that he felt uncomfortable. Suzy asked him to massage her shoulders. Later, Suzy massaged [Petitioner's] shoulders. After a while, [Petitioner] said it was late and he was going to leave. [Petitioner] gave Suzy his phone number and Rivera, Fuentes, and [Petitioner] all left together.

It was pouring rain outside, so the three men hurried toward the bar. Rivera and Fuentes asked [Petitioner] if he wanted to go in the bar with them, but he declined and said he would call a cab. After they went in the bar, [Petitioner] looked for his cell phone and could not find it. He checked for his money and hotel key and found the money but not the key, so he returned to Claudia's apartment to get his phone and key. When Suzy opened the door, he told her he left his phone and key. She invited him in, but he said it was late and he just wanted to get his things and go to the hotel. Suzy looked for the phone and key, but when she still had not found them a few minutes later she said, "Come in. Come in." [Petitioner] entered and Suzy handed him his phone from the table. [Petitioner] closed the door because of the rain and put the phone in his bag. Suzy handed [Petitioner] a towel and as she handed it to him she started kissing him. [Petitioner] said they engaged in "erotic foreplay." He claimed that Suzie then got on her knees and performed oral sex on him.

After several minutes, [Petitioner] said he saw Claudia to his right. "I had the impression that she stayed standing there for several seconds. She had no affect on her face. She was calm." Claudia approached, gently pushed Suzy to the side, grabbed [Petitioner's] penis with her left hand without looking at [Petitioner], and put the penis in her mouth. After a few seconds, she bit down on [Petitioner's] penis. There was a kind of rage on Claudia's face. She scratched down [Petitioner's] chest and tried to punch his face. [Petitioner] pushed Claudia back and she fell down. "Suzy . . . didn't understand what was going on. She looked at me. She looked at Claudia." Claudia got up and approached [Petitioner]. He tried to grab her by the shoulders and Suzy tried to get between them. Claudia started screaming, "You want problem? You want problem?" and she tried to punch [Petitioner] again. [Petitioner] pushed Claudia several times as she kept attacking and trying to hit him. Suzy intervened several times to try to stop Claudia. [Petitioner] testified that at one point Claudia "came up against me and I really got fed up. So with my toes, I kicked her." Claudia "fell back onto [a chair]" and Suzy held her down so [Petitioner] had a chance to get dressed. [Petitioner] took his bag and left the apartment, leaving his coat behind. In his coat was about $450 to $500, all the money he had on him that day.

[Petitioner] considered reporting Claudia to the police, and he discussed the incident the next day with friends, although he did not tell them Claudia bit his penis because he was embarrassed about that. Based on his friends' advice, he did not call the police. Later, Ali told him the police had called and wanted to speak to him. [Petitioner] called the inspector and described what happened in the apartment, and the inspector asked him to come down to see her. [Petitioner] already had a plane ticket to return to France the next day, but he went to her office. When he arrived, she read him his rights, arrested him, and

asked if he wanted to explain what happened. [Petitioner] told her what happened.

As to his prior conviction for rape, [Petitioner] testified that when the incident with Veronique occurred in 1996, he had been celebrating his friend Jouaneix's graduation from university since midafternoon. They had visited at least 10 bars and three or four clubs, and he had consumed 15 to 20 drinks (cocktails and beers) and two doses of ecstasy. When they ran out of money, they decided to steal money for a cab so they could get to their car, which was on the other side of Paris. They walked the streets looking for a man to rob, and eventually noticed someone entering a building. They followed the person up the stairs and found themselves behind a woman about to open her door. [Petitioner] took out a pocket knife and held it up to her neck. He then "behaved like a gangster," making her enter the apartment. He drank half a bottle of whiskey while in her apartment. He did not remember everything that happened in the apartment. The next morning, a police officer told him what happened and [Petitioner] started crying. "[W]hen I realized that I had conducted myself like a monster, I was in despair." In a March 1997 French judicial proceeding, [Petitioner] acknowledged that he had asked the victim to perform fellatio on him twice, asked her to swallow his sperm, asked her to lick his anus, and made comments on how she was licking his anus. [Petitioner] testified at this trial that he made those statements in 1997 based on the victim's own declarations, his codefendant's declarations, and some memories he had of the incident. "I repeated everything that the victim had said. And I assume[d] responsibility." In 1999, [Petitioner] was convicted by a French jury of rape. Although he was sentenced to eight years in prison, he served a total of four years in a detention center as part of a work program due to his young age and lack of criminal history.

Marine Vaisset testified that she met [Petitioner] through a friend one or two weeks after Manai arrived in San Francisco in February 2006. They all went out to a club and danced. Vaisset and [Petitioner] returned to her house, got in her bed, and started kissing. Then he performed oral sex on her. "I was aggressive with him. He didn't want to have sex with me." He only wanted to please Vaisset. They fell asleep and when they awoke in the morning, Manai smoked some cigarettes, talked to her friends, and left. He was never aggressive toward her and she never saw him act aggressively toward anyone else. She was with [Petitioner] and other friends at Place Pigalle in March 2006, and [Petitioner] did not seem drunk that night. When asked on cross-examination if her opinion of [Petitioner] would change if she knew he had been convicted of rape in France in 1999, she said, "I don't know."

Jeni McCoy testified that she met [Petitioner] at a bar in the Mission District. They spent the rest of the evening together and ended up spending the night at the house of McCoy's friend. McCoy and [Petitioner] slept in the same bed, but had no sexual contact and [Petitioner] did not try to force her to perform any sex act. The following day, McCoy and [Petitioner] spent the day together walking around San Francisco and discussing the nonviolent philosophy of Buddhism and she formed the opinion he was a nonviolent person. [Petitioner] never acted aggressively toward her and she never observed him act aggressively toward anyone else. McCoy later went with [Petitioner] and others at [sic] Place Pigalle and [Petitioner] did not seem drunk on that occasion. When she was asked on cross-examination if her opinion of [Petitioner] would change if she knew he had been convicted of rape in Paris in 1999, she said, "I can only tell you based on my experience with the defendant. I have no idea what his character was like 10 years ago."

9

1
2
3
4
5
6
7
8
9

Kenneth Allen Mark, a forensic toxicologist, testified for the defense as a qualified expert in the area of drug and alcohol use and their effects. He explained that, depending on a particular individual's tolerance level, a 0.10 percent blood alcohol level will often cause visible impairment such unsteadiness in walking or difficulty performing simple tasks like taking a license out of a wallet. A 0.15 percent blood alcohol level will cause about half of the population to become "grossly intoxicated," what most people would call "drunk." "They stumble. They fumble around a lot. They are confused to a certain degree." When a person consumes both alcohol and marijuana, "[i]f the amount of marijuana that was smoked was an amount that would affect the individual, . . . it makes a substantial increase in the effect of alcohol." Cocaine is a stimulant and can cause an increase in aggressiveness and libido or sexual drive. A person who drank alcohol, smoked marijuana, and then used cocaine (assuming significant quantities of each) would have impaired perception and judgment, increased aggressiveness, and possibly increased sexual drive. Ordinarily, a first time user of cocaine would be more dramatically affected than someone who had used it before.

10
11
12
13
14
15
16
17
18
19
20

A person five feet four inches tall and weighing 150 pounds (like Suzy) who consumed two pints of beer and three glasses of wine between 8:30 p.m. and midnight, two swigs or shots of whiskey and some cocaine between midnight and 2:00 a.m., and marijuana sometime between 8:30 p.m. and 2:00 a.m. would have a blood alcohol level of between 0.085 and 0.12 percent at 2:00 a.m., and the effects of this blood alcohol level would be enhanced by the marijuana and cocaine to cause the person's judgment to be compromised. At 4:00 a.m., the effects of the marijuana and cocaine would have worn off. If the same person consumed two pints of beer and three glasses of wine between 10:00 p.m. and midnight, two swigs or shots of whiskey and some cocaine between midnight and 2:00 a.m., and marijuana sometime between 10:00 p.m. and 2:00 a.m., she would have a blood alcohol level of between 0.12 and 0.14 percent at 2:00 a.m., and the effects of this blood alcohol level would be enhanced by the marijuana and cocaine to cause the person's judgment to be compromised. A person five feet three inches tall and weighing 110 pounds (like Claudia) who consumed one pint of beer and two glasses of wine between 8:30 p .m. and midnight, and one shot of whiskey and some marijuana and cocaine between midnight and 2:00 a.m. would have a blood alcohol level of about 0.07 percent at 2:00 a.m., and the effects of this blood alcohol level would be enhanced by the marijuana and cocaine. "You are going to have a person whose perception is affected. Their ability to recall might be affected, to a certain extent." At 4:00 a.m., the effects of the marijuana and cocaine would have worn off.

21
22

People v. Manai, No. A120316, 2010 WL 4621824, at *1–9 (Cal. Ct. App., Nov. 16, 2010)

23

(footnotes omitted).

24

## III.    LEGAL STANDARD

25
26
27
28

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C § 2254(a). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim, "(1) resulted in a decision that

**United States District Court**
For the Northern District of California

1   was contrary to, or involved an unreasonable application of, clearly established Federal law,

2   as determined by the Supreme Court of the United States; or (2) resulted in a decision that

3   was based on an unreasonable determination of the facts in light of the evidence presented in

4   the State court proceeding."  28 U.S.C § 2254(d).

5      "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state

6   court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

7   law or if the state court decides a case differently than [the] Court has on a set of materially

8   indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412–13 (2000).  "Under the

9   'reasonable application clause,' a federal habeas court may grant the writ if the state court

10  identifies the correct governing legal principle from [the] Court's decisions but unreasonably

11  applies that principle to the facts of the prisoner's case." Id.  Factual determinations by the

12  state court are "presumed correct absent clear and convincing evidence to the contrary."

13  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  A writ of habeas corpus that challenges a

14  state court's factual determination must be denied unless the petitioner can demonstrate that

15  the state court's finding was "objectively unreasonable in light of the evidence presented in

16  the state-court proceeding." See id.

17     "AEDPA's standard is intentionally 'difficult to meet.'" Woods v. Donald, No. 14-

18  618, 2015 U.S. LEXIS 2123, at *5 (2015) (quoting White v. Woodall, 134 S. Ct. 1697, 1702

19  (2014)).  "[A] federal habeas court may not issue the writ simply because the court concludes

20  in its independent judgment that the relevant state-court decision applied clearly established

21  law erroneously or incorrectly.  Rather, that application must also be unreasonable."

22  Williams, 529 U.S. at 411.  A federal habeas court making the "unreasonable application"

23  inquiry should ask whether the state court's rejection of the claim was "objectively

24  unreasonable" in clearly established federal law. Harrington v. Richter, 562 U.S. 86, 99–100

25  (2011); Williams, 529 U.S. at 409.  "A state court's determination that a claim lacks merit

26  precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

27  correctness of the state court's decision." Harrington, 562 U.S. at 101 (quoting Yarborough

28  v. Alvarado, 541 U.S. 652, 664 (2004)).  The only definitive source of clearly established

federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision.  Williams, 529 U.S. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003).  While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings must be "reasonably" applied.  Clark, 331 F.3d at 1069.  "It is settled that a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents.'"  Nevada v. Jackson, 133 S. Ct.  1990, 1992 (2013) (per curiam) (quoting Harrington, 562 U.S. at 101).

Finally, a federal court must consider whether any constitutional error at trial "had substantial and injurious effect or influence in determining the jury's verdict," because petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'"  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (citations omitted).

## IV.    DISCUSSION

Petitioner brings four claims for federal habeas relief.  First, Petitioner claims that the trial court violated his Sixth Amendment right to confrontation and his Due Process right to present a full defense by precluding him from either inquiring into or presenting testimonial evidence of an alleged intimate relationship between the two complaining witnesses.  Second, Petitioner claims that the trial court denied his Sixth Amendment right to an impartial jury and his Due Process right to a fair trial when it refused to replace a juror during trial despite defense counsel's expressed concerns of bias.  Third, Petitioner claims that the trial court violated his Due Process right to a fair trial by admitting unduly prejudicial propensity evidence of Petitioner's past foreign crime.  Fourth, Petitioner claims that the cumulative effect of the trial court's errors denied him his Due Process right to a fair trial.  As described below, Petitioner's claims lack merit.

**1.**     **Confrontation Clause and Due Process Right to Present a Full Defense**

Petitioner first claims that the trial court, by restricting his cross-examination of Suzy and Claudia as to whether they were involved in a sexual relationship, and preventing his offering testimonial evidence of its existence if they denied one, violated his Sixth Amendment right to expose his accusers' motivation to lie.  Pet. at 19.  Petitioner additionally claims that the trial court, by preventing him from presenting witness testimony about Suzy and Claudia's alleged sexual relationship, violated his Due Process right to present a full defense, as the Jury was left to question why Claudia would attack him in the manner he described and why the two girls would fabricate a story accusing him of criminal acts.  Id.  However, under section 2254(d), it cannot be said that the California Court of Appeal's rejection of  Petitioner's claims were unreasonable in light of federal law as determined by the Supreme Court.  See 28 U.S.C. § 2254(d); Harrington, 562 U.S. at 99–100; Williams, 529 U.S. at 409.  Petitioner is not entitled to federal habeas relief on either Confrontation Clause or Due Process grounds.

**a.**     **Background**

The Defense's theory of the case was that Claudia and Suzy were involved in an sexual relationship, and that when Claudia found the Suzy and Petitioner engaged in a consensual act, she attacked Petitioner in a jealous rage.  C.T.1 at 279.  Suzy and Claudia then created the story of the sexual assault in an effort to lie to the police and protect Claudia from prosecution for assault.  Id. at 279–80.

Prior to trial, the Prosecution filed a motion to exclude evidence of Suzy and Claudia's sex lives, pursuant to California Evidence Code section 1103(c)(1).  Manai, 2010 WL 4621824, at *14.  Concurrently, Petitioner filed a motion to admit evidence of a sexual relationship between the women pursuant to Evidence Code section 782.[3]  Id.; C.T.1 at 266.

---

[3] These code sections comprise a central part of California's Rape-Shield laws.  Evidence Code section 1103(c)(1) prohibits introduction of specific instances of a complaining witness's sexual conduct to prove consent.  Section 782 balances that prohibition by providing that evidence of sexual conduct may be offered to attack the credibility of a complaining witness and prescribes the procedure for offering that evidence.  This includes filing a motion supported by a sealed offer of proof and a subsequent section 402 hearing if the offer is found sufficient.  Section 782 evidence is

The trial court denied Petitioner's request, holding that Petitioner's offer of proof, witness Jeni McCoy who would testify that the women were "kissing and fondling each other" in the bar, was insufficient to require an evidentiary hearing as it was based solely on a one-time observation of Suzy and Claudia, and McCoy had no other knowledge or connection with the women.[4]  Manai, 2010 WL 4621824, at *14; R.T.1 at 42.  The court found that, in light of the limited knowledge of the witness, the probative value was slight.  Id.  The court expressed further concern that Petitioner was using the proffer as a backdoor around the proscriptions of the Rape-Shield laws and, while offered for motive, would be substantially misleading or potentially prejudicial.  R.T.1 at 41, 43–44.

Balancing the Confrontation Clause and Due Process concerns expressed in Petitioner's motion to admit the evidence, the court specified that while Petitioner was barred from using an independent witness to examine the sexual relationship of the two women, the defense was not precluded from cross-examining the witnesses as to the depth of their relationship such as would motivate the women to lie for one another.  R.T.1 at 43.  Specifically, the court held:

> Let me also say this, however, that does not preclude certainly [Defense counsel] from examining the complaining witnesses, each of them, as to their relationships one to the other.  It does not preclude him from certainly establishing through their cross-examination that their friendship, close ties, relationship over a period of years is such that it would induce one to fabricate a story or to support the story of the other.
>
> I think that's still fair game.  However, with regard to the examination as to sexual relationship of one to the other by the way of presentation of evidence through the independent witness, it is not going to be permitted.

Id.

---

admissible subject to balancing for prejudice pursuant to Evidence Code section 352.

[4]  McCoy was the subject of a section 402 hearing in the November trial, also resulting in the exclusion of her testimony on the women's relationship.  Manai, 2010 WL 4621824, at *14 n.15.  While not a part of the offer of proof, Petitioner argued before the trial court and in his petition that the women actually told McCoy about their relationship.  Pet. at 21; R.T.1 at 43.  McCoy's testimony in the November hearing reveals that while she did not actually have a conversation with the women about their relationship and didn't recall either actually saying that the other was her girlfriend, McCoy felt that the relationship was clearly "on the table" based on their body language, embracing, and that one woman's hand was on the other woman's leg.  R.T. (2d Trial) at 1008.

United States District Court
For the Northern District of California

### b.   Analysis

Petitioner's claim that the trial court violated his Confrontation Clause rights by precluding cross-examination of Suzy and Claudia regarding the existence of an intimate relationship fails as Petitioner has not shown that the state court's decision is either contrary to a Supreme Court decision with materially indistinguishable facts, or that it is an unreasonable application of clearly established federal law.  See 28 U.S.C. § 2254(d); Harrington, 562 U.S. at 99–100.

The Confrontation Clause of the Sixth Amendment provides that in criminal cases, the accused has the right to "be confronted with the witnesses against him."  U.S. Const. amend. VI.  The federal confrontational right applies to state proceedings through the Fourteenth Amendment.  Pointer v. Texas, 380 U.S. 400, 403 (1965).  The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee.  Crawford v. Washington, 541 U.S. 36, 61 (2004).  It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.  Id.; see Davis v. Alaska, 415 U.S. 308, 315–16 (1974) (noting a primary interest secured by the Confrontation Clause is the right of cross-examination).

The Confrontation Clause guarantees an opportunity for effective cross-examination, but not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.  Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam); see, e.g., Coleman v. Calderon, 150 F.3d 1105, 1112 (9th Cir. 1998) (Confrontation Clause does not require that prosecutor disclose evidence that will help defense effectively cross-examine a prosecution witness), rev'd and remanded on other grounds, Calderon v. Coleman, 525 U.S. 141, 147 (1998).  The right to cross-examination "'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'"  Michigan v. Lucas, 500 U.S. 145, 149 (1991) (quoting Rock v. Arkansas, 483 U.S. 44, 55).  Accordingly, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examinations based on concerns about, among other things,

United States District Court
For the Northern District of California

harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). Still, a court may violate the Confrontation Clause if it prevents a defendant from examining a particular and relevant topic. See Fenenbock v. Dir. of Corr., 692 F.3d 910, 919 (9th Cir. 2012). Application of evidentiary rules which exclude cross-examination on a particular topic may be found unconstitutional where those limits restrict a criminal defendant's right to confront adverse witnesses in a way that is "'arbitrary or disproportionate to the purposes [the rules] are designed to serve.'" See Lucas, 500 U.S. at 151 (quoting Rock, 483 U.S. at 56).

Similarly, whether grounded in the Sixth Amendment's guarantee of compulsory process or in the more general Fifth or Fourteenth Amendments' guarantees of due process, "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (quoting Crane v. Kentucky, 476 U.S. 683 690 (1986)); see California v. Trombetta, 467 U.S. 479, 485 (1984) (due process); Chambers v. Mississippi, 410 U.S. 284, 294 (1973) (compulsory process). That guarantee includes the defendant's right to present evidence, including the testimony of witnesses. See Washington v. Texas, 388 U.S. 14, 19 (1967). But the Supreme Court has also recognized that "'state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." Jackson, 133 S. Ct. at 1992 (quoting Holmes, 547 U.S. at 324); see U.S. v. Scheffer, 523 U.S. 303, 308 (1998). A court does not violate the right to present a defense any time such evidence is excluded under a rule of evidence, rather when those rules are applied mechanistically, Chambers, 410 U.S. at 302, or the exclusion is "arbitrary or disproportionate to the purposes [the exclusionary rule applied is] designed to serve," Holmes, 547 U.S. at 324 (internal citation and quotation marks omitted); see Lucas, 500 U.S. at 151. See LaGrand v. Stewart, 133 F.3d 1253, 1266 (9th Cir. 1998) (summarizing Supreme Court case law defining a defendant's right present a complete defense). Additionally, the right is only implicated when the evidence the

defendant seeks to admit is "relevant and material, and . . . vital to the defense."

Washington, 388 U.S. at 16.

Here, the California Court of Appeal rejected Petitioner's Confrontation Clause and

Due Process claims as follows:

> **[]Legal Standards**
> A defendant generally cannot question a sexual assault victim about his or her prior
> sexual activity.  (§ 1103, subd. (c)(1); People v. Woodward (2004) 116 Cal.App.4th
> 821, 831.)  A limited exception is provided if the victim's prior sexual history is
> relevant to the victim's credibility.  (§ 1103, subd. (c)(5); People v. Chandler (1997)
> 56 Cal.App.4th 703, 707 (Chandler ).)
>
> Section 782 provides that in a prosecution under section 288a, "if evidence of sexual
> conduct of the complaining witness is offered to attack the credibility of the
> complaining witness under Section 780, the following procedure shall be followed:
> [¶] (1) A written motion shall be made by the defendant to the court and prosecutor
> stating that the defense has an offer of proof of the relevancy of evidence of the
> sexual conduct of the complaining witness proposed to be presented and its
> relevancy in attacking the credibility of the complaining witness.  [¶] (2) The written
> motion shall be accompanied by an affidavit in which the offer of proof shall be
> stated.  The affidavit shall be filed under seal and only unsealed by the court to
> determine if the offer of proof is sufficient to order a hearing pursuant to paragraph
> (3).  After that determination, the affidavit shall be resealed by the court.  [¶] (3) If
> the court finds that the offer of proof is sufficient, the court shall order a hearing out
> of the presence of the jury, if any, and at the hearing allow the questioning of the
> complaining witness regarding the offer of proof made by the defendant.  [¶] (4) At
> the conclusion of the hearing, if the court finds that evidence proposed to be offered
> by the defendant regarding the sexual conduct of the complaining witness is relevant
> pursuant to Section 780, and is not inadmissible pursuant to Section 352, the court
> may make an order stating what evidence may be introduced by the defendant, and
> the nature of the questions to be permitted.  The defendant may then offer evidence
> pursuant to the order of the court."  (§ 782, subds.(a), (c)(1).)
>
> Section 782 provides for a strict procedure that includes a hearing outside the
> presence of the jury prior to the admission of evidence of the complaining witness's
> sexual conduct.  (Chandler, supra, 56 Cal.App.4th at p. 708.)  "[S]ection 782 is
> designed to protect victims of molestation from 'embarrassing personal disclosures'
> unless the defense is able to show in advance that the victim's sexual conduct is
> relevant to the victim's credibility. [Citation.]" (People v. Bautista (2008) 163
> Cal.App.4th 762, 781–782 (Bautista ).)
>
> At least one court has noted an inherent tension between section 782 and section
> 1103, subdivision (c)(1) [formerly § 1103, subd. (b)(1)—prohibiting use of specific
> acts of sexual conduct by the victim to prove consent].  (People v. Rioz (1984) 161
> Cal.App.3d 905, 915 (Rioz ).)  The procedures provided under section 782 and the
> discretion provided to the trial court in determining admissibility provides an
> appropriate resolution of that tension by "recogniz[ing] both the right of the victim
> to be free from unwarranted intrusion into her privacy and sexual life beyond the
> offense charged and the right of a defendant who makes the necessary sworn offer of
> proof in order to place the credibility of the complaining witness at issue to fully
> establish the proffered defense."  (Rioz, at p. 917.)  "Great care must be taken to
> insure that this exception to the general rule barring evidence of a complaining
> witness' prior sexual conduct . . . does not impermissibly encroach upon the rule

itself and become a 'back door' for admitting otherwise inadmissible evidence." (Id. at p. 918–919.)

"[S]ection 782 vest[s] broad discretion in the trial court to weigh the defendant's proffered evidence, prior to its submission to the jury, and to resolve the conflicting interests of the complaining witness and the defendant.  Initially, the trial court need not even hold a hearing unless it first determines that the defendant's sworn offer of proof is sufficient." (Rioz, supra, 161 Cal.App.3d at p. 916.)  The offer is "sufficient" if the judge determines that the evidence, assuming it is as defendant claims, is relevant, and that its probative value is not outweighed by the probability of undue prejudice or the undue consumption of trial time.  (People v. Blackburn (1976) 56 Cal.App.3d 685 (Blackburn).)  Even if a hearing is then held, the statute specifically reaffirms the trial court's discretion, pursuant to section 352, to exclude relevant evidence which is more prejudicial than probative. (Rioz, supra, at p. 916.) "'A trial court's ruling on the admissibility of prior sexual conduct will be overturned on appeal only if appellant can show an abuse of discretion.'" (Bautista, supra, 163 Cal.App.4th at p. 782.)

**[]Analysis**
We first disagree with [Petitioner's] contention that the evidence he proffered was not evidence of sexual conduct within the meaning of sections 1103 and 782, and that it was not subject to the limitations of those sections.  "[S]exual conduct, as that term is used in sections 782 and 1103, encompasses any behavior that reflects the actor's or speaker's willingness to engage in sexual activity.  The term should not be narrowly construed."  (People v. Franklin (1994) 25 Cal.App.4th 328, 334, fn. omitted (Franklin).)

[Petitioner] is correct that sections 1103 and 782 do not require the exclusion of all evidence of a complaining witness's sexual conduct.  There is "a distinction between evidence of prior sexual conduct offered to prove the character of the complaining witness and evidence of such conduct offered on a noncharacter theory.  [Citations.] . . . [N]oncharacter evidence relevant to the witness's credibility may still be admissible even though involving prior sexual conduct. . . .  '[W]hen the evidence is offered on a noncharacter theory, the mere fact of prior sexual conduct is never in itself important.  It becomes important only when linked with other facts that prove, for example, modus operandi or motive to lie. . . .' [Citation.]" (People v. Steele (1989) 210 Cal.App.3d 67, 75.)

Sections 1103 and 782 are designed to exclude evidence only if the jury is asked to infer from the witness's sexual conduct that the witness had a character that made him or her likely to consent to engage in sexual activity with the defendant.  In Franklin, a defendant facing a child sexual abuse charge sought to introduce evidence that the alleged victim had falsely accused her mother of committing a sexual offense against her.  (Franklin, supra, 25 Cal.App.4th at pp. 330, 335.)  The court of appeal held the evidence should have been admitted even though the defendant had not complied with section 782.  (Id. at pp. 334–335.)  "Even though the content of the statement has to do with sexual conduct, the sexual conduct is not the fact from which the jury is asked to draw an inference about the witness's credibility.  [Instead, t]he jury is asked to draw an inference about the witness's credibility from the fact that she stated as true something that was false." (Id. at p. 335; see also People v. Tidwell (2008) 163 Cal.App.4th 1447, 1455–1456 [evidence that witness who alleged rape had made prior false rape claims was not subject to § 782].)  In People v. Varona, a defendant facing rape and forcible oral copulation charges offered evidence that the complaining witness was a prostitute who specialized in oral copulation.  (People v. Varona (1983) 143 Cal.App.3d 566, 568.)  The court of appeal held the trial court abused its discretion in denying a motion to

admit the evidence under section 782 because the evidence directly contradicted the complaining witness's testimony about why she was at the location where she met the defendant, and corroborated defendant's testimony that she agreed to perform the sexual acts for pay. (Id. at pp. 569–570.) In Rioz, the defendant's conviction (and that of his codefendants) was reversed and remanded on the ground that the defendants had been improperly required to share an interpreter. (Rioz, supra, 161 Cal.App.3d at p. 913.) The court held that on retrial the trial court was required to consider the admissibility of evidence alleging that the victim was a prostitute who had offered sex for money. (Id. at pp. 918–919.) The court noted, however, that in considering such evidence the trial court should insist on strict compliance with the statutory requirements of section 782, and that a defendant advancing a defense of consent bears the burden of affirmatively offering to prove, under oath, the relevance of the complaining witness's sexual conduct to attack her credibility in some way other than by deprecating her character. (Ibid.) The court also noted that the trial court retained its discretion under section 352 to determine the admissibility of the evidence after conducting a section 782 hearing. (Ibid.)

[Petitioner] argued that he did not seek to introduce evidence of Suzy and Claudia's purported relationship on a prohibited character theory. Rather, he contended that because Claudia had a sexual relationship with (or interest in) Suzy, she reacted with anger and jealousy when she witnessed what [Petitioner] testified was Suzy's voluntary, consensual oral copulation of [Petitioner]. He asserted that, fueled by this jealousy, Claudia attacked him, and perhaps because of the sexual source of her anger she attacked him sexually, by taking his penis in her mouth and biting down on it. This theory asked the jury to infer from the strength and nature of Claudia's alleged feelings for Suzy that [Petitioner's] description of her behavior was credible, and from Suzy and Claudia's mutual feelings for each other that they had a motive subsequently to lie about what occurred that night. Even under that theory, however, [Petitioner] was offering evidence of specific acts of sexual conduct to "attack the credibility of the complaining witness," triggering the review requirements under section 782. The court made that review, finding the probative value of the offered evidence to be slight, and insufficient to trigger a further evidentiary hearing.

The trial court was well within its discretion, under section 352, in determining that, even assuming [Petitioner's] offer of proof was true, and that the evidence was relevant and had some probative value, its probative value was outweighed by the probability of undue prejudice or the undue consumption of trial time. (Blackburn, supra, 56 Cal.App.3d at pp. 691–692.) Here, the trial court expressly found that the probative value of the proffered evidence was slight because it was based on a witness's one-time observation of the victims in a bar. Further, even if we were to accept that Suzy and Claudia had a sexual relationship (or that Claudia had a sexual interest in Suzy), the probative value of the evidence to prove that Claudia acted in the manner described by [Petitioner] would be slight. If the motive for what [Petitioner] claimed was Claudia's physical assault on him was jealous anger, he fails to explain how this is also consistent with his claim that Claudia initially joined willingly in the sexual encounter, even after allegedly walking in on a cheating sexual partner.

On the other side of the scale, the potential prejudicial effect of such evidence is apparent. While not directly offered on a character theory, there was a danger that the jury would consider the evidence for this purpose. Moreover, there was a danger of undue consumption of time by examination and cross-examination of McCoy on this matter and presentation of rebuttal evidence by the prosecution.

19

We find no abuse of the broad discretion vested in the trial court to weigh the defendant's proffered evidence, and to resolve the conflicting interests of the complaining witness and the defendant.  (Rioz, supra, 161 Cal.App.3d at p. 916.)

[Petitioner] also argues the exclusion of this evidence violated his federal constitutional right to present a defense.  Ordinarily, the application of state rules of evidence such as section 352 does not implicate a criminal defendant's federal constitutional rights.  (Lewis, supra, 46 Cal.4th 1255, 1289; People v. Hall (1986) 41 Cal.3d 826, 834.)  Section 352 "must bow to the due process right of a defendant to a fair trial and to his right to present all relevant evidence of significant probative value to his defense."  (People v. Reeder (1978) 82 Cal.App.3d 543, 553.)  For the reasons already discussed, the probative value of the evidence proffered by [Petitioner] was slight and its exclusion did not deprive him of a federal constitutional right.  Further, "[a] trial court's limitation on cross-examination pertaining to the credibility of a witness does not violate the confrontation clause unless a reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted." (People v. Quartermain (1997) 16 Cal.4th 600, 623–624; Bautista, supra, 163 Cal.App.4th at p. 783.)  We see nothing in this record to indicate that the jury received a misleading impression of the credibility of the complaining witnesses.

**[]Prejudice**

Even if exclusion of the offered evidence were error, we would have no difficulty in finding it harmless.  That is, there is no reasonable probability that exclusion of the evidence had an effect on the verdict.  (See People v. Samuels (2005) 36 Cal.4th 96, 113 [harmless error analysis for evidentiary error governed by People v. Watson (1956) 46 Cal.2d 818, 836].)  First, when the same issue arose in the November 2006 trial, the judge who heard McCoy's testimony at the Evidence Code section 402 hearing was not persuaded that the women McCoy described were even Suzy and Claudia.  "Ms. McCoy ... described the two females as edgy looking, eccentric, ... she thought one might have had dread locks and one was Latina, and I observed the two complaining witnesses testify here.  It's not at all clear to me what ethnicity they are from, what edgy looking or eccentric means.  One or maybe both had their hair the day they testified in some kind of modified dread lock look.  The description that Ms. McCoy gave of the two women who she allegedly saw that day is not at all [ ] obvious[ ] it's these individuals.  And she has said she has never seen them since.  [¶] I am concerned about the probative value versus the prejudicial value."  We can infer from these comments that, had the jury also had the opportunity to compare McCoy's description of the women to the complaining witnesses who appeared before them, they would have had some or substantial doubt whether McCoy was describing Suzy and Claudia and thus the persuasive value of the evidence would have been slight.

Second, despite the denial of [Petitioner's] motion, the jury heard substantial evidence about the nature of Suzy and Claudia's relationship, including some evidence that suggested they might be sexually involved.  They heard that Suzy and Claudia had known each other for 13 years, that they were best friends, that they saw each other most days after work, that Suzy planned to spend the night at Claudia's apartment on the night of the attack while Claudia's husband was away, and that Suzy and Claudia separated from their male partners following the incident, moved in together, and at least occasionally shared the same bed.  They heard that Suzy was very friendly with Manai at Place Pigalle while Claudia was more reserved, and that Suzy invited or encouraged Manai to join the other four at Claudia's apartment while Claudia was reluctant to let him come over.  This evidence provided some support to [Petitioner's] defense.

Third and most importantly, even if the jury had been provided with unequivocal evidence that Suzy and Claudia had a sexual relationship, it is not reasonably probable the jury would have discredited Suzy and Claudia's account of the incident on this basis because of the abundant evidence corroborating their account. Within minutes of [Petitioner's] final departure from the apartment, Suzy called 911 in hysterics and reported a sexual assault. The jury heard the recorded call, which even from the cold paper record reflects the victims' fear through their episodes of crying and hyperventilation, their panicked syntax, and their insistence that the police clearly identify themselves before they opened the apartment door. Officer Mahoney, who observed the victims immediately following the call, described their hysterical and distraught behavior to the jury. Thayer and Laws confirmed the witnesses' continuing emotional distress only two hours later. [Petitioner] offers no explanation of why the complaining witnesses would have behaved in this manner and on this timeline if, as he contends, their stories were collusive fabrications. Moreover, the victims' physical injuries were consistent with their testimony; their full cooperation with the district attorneys' office following the incident was more consistent with an honest report of a crime than with a false report that might unravel on investigation; and the properly-admitted evidence of the 1996 Paris crime dramatically demonstrated that [Petitioner] had a disposition to commit sexual offenses like those described by Suzy and Claudia.

[Petitioner] devoted much of his closing argument at the trial to inconsistencies in Suzy and Claudia's description of the incident at trial and in their various memorialized accounts of the incident. We conclude that, when the accounts are considered in their entireties and the timing of the reports are taken into consideration, the inconsistencies were not substantial compared to the overall consistency of the reports.

Finally, the jury had little difficulty reaching a verdict, which suggests they did not find the credibility determinations a close call. The jury began its deliberations on February 1, 2007, at 10:55 a.m. and asked to be released for the day at 4:05 p.m. At that time, they asked a question about an apparent difference in the definition of burglary in count 1 and in the section 667.61 allegations for counts 2 and 4. When the jury reconvened on February 2 at 10:00 a.m., they received an answer to that question and they returned a verdict at 12:40 p.m. These circumstances strongly suggest that within about four hours of beginning deliberations (not counting their lunch break), the jury had determined that [Petitioner] was guilty of the sexual offenses and was already working on the details of the other charges, which they resolved the following morning after receiving additional guidance from the court.

Because the probative value of the excluded evidence was slight, the evidence corroborating their account of the incident was strong, and the jury apparently had little difficulty in crediting the complaining witnesses' testimony over [Petitioner's], we conclude that the exclusion of the evidence, even if error, was harmless.

Manai, 2010 WL 4621824, at *13–19 (footnotes omitted).

Petitioner argues that the trial court's denial of his motion to cross-examine is similar to the facts adjudicated by the Supreme Court in Olden v. Kentucky, 488 U.S. 227 (1988) (per curiam), and thus the state court's rejection of his Confrontation Clause claim warrants habeas relief from this Court. However, the facts here are materially distinguishable from those before the Olden Court, and the decision here is not contrary to the holding in that case.

21

United States District Court
For the Northern District of California

1    Petitioner is not entitled to habeas relief on those grounds.  See 28 U.S.C. § 2254(d);

2    Williams, 529 U.S. at 412–13 (holding that a federal habeas court may grant the writ under

3    the "contrary to" clause if the state court decides differently than the Supreme Court on a set

4    of materially indistinguishable facts).

5          In Olden, the Supreme Court reversed a forcible sodomy conviction where the

6    defendant claimed that the trial court violated his Confrontation Clause rights by denying

7    him the opportunity to cross-examine the complaining witness about a relationship that gave

8    her motive to lie about the night's events.  See 488 U.S. at 228–29.  At trial, Olden argued

9    that on the night in question he met up with the complaining witness, Matthews, in a bar and

10   the two engaged in a night of consensual sex at various locations.  Id. at 229.  Afterwards, at

11   Matthews' request, Olden dropped her off outside the house of the man, Russell, with whom

12   she was then having an affair.  Id. at 230.  Russell saw Matthews get out of Olden's car and,

13   when Russell came out of the house to investigate, Matthews immediately told him that she

14   had been kidnapped and raped at knife-point by Olden and another man.  Id. at 229.  Olden

15   argued that Matthews concocted the rape story to protect her relationship with Russell.  Id. at

16   230.  However, the court refused to allow the defense to question Matthews about her

17   relationship with Russell, with whom she was living by the time of the trial, even when she

18   falsely testified that she was living with her mother.  Id.  The jury returned what the Supreme

19   Court deemed a "puzzling verdict" in which Olden's co-defendant was acquitted while

20   Olden, though acquitted of rape and kidnapping, was convicted of forcible sodomy.  Id.

21         The Kentucky Court of Appeals upheld the conviction and, specific to the

22   Confrontation Clause issue, held that the evidence was properly excluded on the basis that

23   Matthews was white and Russell was black and that admitting testimony that the two lived

24   together would have created extreme prejudice against Matthews.  Id. 230–31.  Reversing the

25   state court's decision, the U.S. Supreme Court held that while courts have broad discretion to

26   impose reasonable limits to take account of legitimate trial concerns, in this case the

27   "[s]peculation as to the effect of jurors' racial biases [could not] justify exclusion of

28

United States District Court
For the Northern District of California

cross-examination with such strong potential to demonstrate the falsity of Matthews' testimony."  Id. at 232.

Unquestionably, there are similarities between Petitioner's claim and the facts in Olden.  Like the Olden defendant, Petitioner here claimed a defense of consent.  Manai, 2010 WL4621824, at *7.  Petitioner also argued to the trial court that the two complaining witnesses' intimate relationship provided them with a motive to lie about the incidents of the night in question.  See C.T.1 at 279–80.  Specifically, here, Petitioner argued that the women concocted the story in order to protect Claudia from potential prosecution.  Id.  Petitioner, like the Olden defendant, also argues that when the trial court prevented his questioning the women about their intimacy, his Confrontation Clause rights were violated.

However, a material issue of fact distinguishes this case from Olden.  The Court in Olden held that the trial court's general "speculation as to the [prejudicial] effect of juror's racial bias" was insufficient to overcome the Olden's right to cross-examination.  488 U.S. at 232.  Here, both the trial court and the state court of appeal held that the proffered testimony directly implicated the state's Rape-Shield statutes, which was explicitly not a part of the consideration in Olden.  Compare Manai, 2010 WL 4621824, at *16 (finding that Petitioner's proffered evidence was evidence of sexual conduct within the meaning of sections 1103 and 782), with Olden, 488 U.S. at 230 (finding that the state court held that the proffered evidence did not implicate Kentucky's rape-shield statutes).  The state court's finding on this subject is binding on this Court.  See Estelle v. McGuire, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.");  Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005) (errors in state law cannot form basis for federal habeas relief).

The Supreme Court has recognized that state rape-shield statutes represent a "valid legislative determination that rape victims deserve heightened protection against surprise, harassment, and unnecessary invasions of privacy."  Lucas, 500 U.S. at 150.  These considerations are "in addition to the traditional considerations of prejudice and confusion of the issues that trial courts must balance against probity" that were the Court considered in

**United States District Court**
For the Northern District of California

Olden.  See Wood v. Alaska, 957 F.2d 1544, 1552 (9th Cir. 1992).  The additional

considerations prescribed by California's Rape-Shield laws distinguish this case from Olden.

Under § 2254(d), the state court's rejection of Petitioner's Confrontation Clause claims is

therefore not "contrary to" the Supreme Court's decision in Olden.

Nor does the Supreme Court's holding in Olden dictate that this Court find the state

court's rejection of Petitioner's Confrontation Clause claim to be an objectively unreasonable

application of clearly established federal law.  See 28 U.S.C. § 2254(d).  When analyzing a

habeas claim for violation of a petitioner's Confrontation Clause rights, district courts in the

Ninth Circuit utilize the approach applied in Fowler v. Sacramento County Sheriff's

Deptartment to determine if the limitation was objectively unreasonable.  421 F.3d 1027,

1038 (9th Cir. 2005).  First, the court must consider "whether the proffered cross-

examination sufficiently bore upon [the complaining witnesses'] reliability or credibility such

that a jury might reasonably have questioned it."  Id.  Second, if so, the court must consider

"whether the trial court's preclusion of this cross-examination was unreasonable, arbitrary or

disproportionate given its concerns given its concerns about waste of time, confusion, and

prejudice."  Id.; see Wood, 957 F.2d at 1550.

Here, Petitioner argues that evidence of the women's intimacy sufficiently bore upon

their credibility that a reasonable jury would have questioned it, satisfying the first prong of

the Fowler test, and that "no countervailing interests reasonably justified the trial court's

[decision]," satisfying the second prong of the Fowler test.  Pet. at 32.  Not so.

Certainly the Supreme Court has long held that the right of a criminal defendant to

expose a witness's motivation is an important function of the Confrontation Clause.  See,

e.g., Olden  488 U.S. at 230–31; Davis, 415 U.S. at 316 (holding exposure of a witness's

motivation in testifying is an important function of cross-examination) (citing Greene v.

McElroy, 360 U.S. 474, 496 (1959)).  Here, the complaining witnesses' sexual history was

relevant to Petitioner's claim that they had a motive to lie.  The Court has likewise held that,

in some situations, state evidentiary protections must bow to a defendant's confrontation

clause rights.  See, e.g., Davis, 415 U.S. at 319 (holding that a state law making records of

United States District Court
For the Northern District of California

juvenile offense inadmissible unconstitutionally limited the scope of defendant's cross-examination of an adverse witness for bias).  However, these cases must be read in conjunction with other clearly established federal law giving trial courts broad latitude to balance the Sixth Amendment rights of a criminal defendant with other legitimate concerns of the court and complaining witnesses.  See, e.g., Lucas, 500 U.S. at 149–50 (trial courts may reasonably limit a criminal defendant's right to cross-examine a witness based on concerns represented in state rape-shield statutes); Van Arsdall, 475 U.S. at 679 (trial courts retain wide latitude to limit a criminal defendant's Confrontation Clause rights based on legitimate trial concerns).

Here, the trial court precluded examination of a sexual relationship between the complaining witnesses through the use of extrinsic evidence but allowed the defense to cross-examine the women about their "relationship over a period of years . . . such that it would induce one to fabricate . . . or to support the story of the other."  See R.T.1 at 43.  In doing so, the trial court attempted to address both the Constitutional right of the Petitioner to expose the complaining witnesses's motive to lie, while also recognizing legitimate protections due to the complaining witnesses as rape victims.  Jury perception of a "relationship over a period of years" could differ from that of a sexual relationship.  But, the Supreme Court has frequently warned that where, as here, "the 'precise contours' of [a] right remain unclear, state courts enjoy 'broad discretion' in their adjudication of a prisoner's claims."  See Woods v. Donald, No. 14-618, 2015 U.S. LEXIS 2123, at *9 (U.S. Mar 30, 2015) (quoting White v. Woodall, 134 S. Ct. 1697, 1705 (2014) (in turn quoting Lockyer v. Andrade, 538 U.S. 63, 76 (2003), in turn quoting Harmelin v. Michigan, 501 U. S. 957, 998 (1991) (Kennedy, J., concurring in part and in judgment)).  A reasonable jurist employing that discretion here could find the trial court's counterveiling interests reasonably justified its decision on where the balance lay.  Compare Davis, 415 U.S. at 318 (holding that a defendant's Confrontation Clause rights were violated where he was unable to make any record from which to argue that the prosecution witness was biased), with Wood, 957 F.2d at 1553 (holding that where the defendant was allowed to present his theory that he and the complaining witness had a

**United States District Court**
For the Northern District of California

1    prior sexual relationship, his Confrontation Clause rights were not violated by the trial

2    court's exclusion of other relevant evidence of the complaining witnesses' sexual history).

3            Accordingly, the California Court of Appeal engaged in a thorough consideration

4    which balanced the probity of the proffered cross-examination against the substantial

5    potential for prejudice.  The state court found that the trial court's balance, given Petitioner's

6    evidence and the high potential for prejudice inherent in questioning the two victims about an

7    extra-marital sexual relationship, was a reasonable one as it avoided the proscriptions of the

8    Rape-Shield statute while allowing the jury some evidence by which to draw conclusions

9    about the women's closeness.  See Manai, 2010 WL 4621824, at *17–18.  A reasonable jurist

10   could find that the state court was not unreasonable in finding that the restrictions were not

11   arbitrary or disproportionate to the legitimate purposes they were designed to serve.  See

12   Lucas, 500 U.S. at 151.  "The Supreme Court consistently has held that a Confrontation

13   Clause violation occurs when a trial judge prohibits any inquiry into why a witness may be

14   biased.  However, when some inquiry is permitted, trial judges retain wide latitude. . . .  No

15   Confrontation Clause violation occurs as long as the jury receives sufficient information to

16   appraise the biases and motivations of the witness."  Fenenbock v. Dir. of Corr. for Cal., 692

17   F.3d 910, 919-20 (9th Cir. 2012) citing Hayes v. Ayers, 632 F.3d 500, 518 (9th Cir. 2011)

18   (emphasis in original); see also Wood, 957 F.2d at 1551 (holding that even relevant evidence

19   may properly be excluded if its probative value is outweighed by other legitimate interests).

20           On balance, and under the standards of section 2254(d), this Court simply cannot say

21   that the state court's rejection of Petitioner's claim is so erroneous that "there is no

22   possibility fairminded jurists could disagree that the . . . decision conflicts with [the Supreme

23   Court's] precedents."  See Harrington, 562 U.S. at 101.  While the trial court could

24   reasonably have ruled differently, this Court cannot say that the limitation struck, which

25   allowed questioning about the relationship while excluding extrinsic proof of a sexual

26   relationship, was "beyond reason."  See Olden, 488 U.S. at 232.  Petitioner is not entitled to

27   federal habeas relief on his claim that the trial court violated his Confrontation Clause rights.

28   The state court's rejection of the claim was not contrary to, nor did it involve an

**United States District Court**
For the Northern District of California

1   unreasonable application of, clearly established Supreme Court precedent.  See 28 U.S.C. §

2   2254(d).

3          Petitioner's claim that the exclusion of Jeni McCoy's witness testimony violated his

4   Due Process likewise fails.  Petitioner argues that McCoy's impeachment testimony was

5   "critical corroborative defense evidence" and that its exclusion "significantly undermined

6   fundamental elements of [Petitioner's] defense," thus violating his constitutional right to

7   present a complete defense.  Pet. at 31 (citing DePetris v. Kuykendall, 239 F.3d 1057, 1062

8   (9th Cir. 2001), and Scheffer, 523 U.S. at 315, respectively).

9          However, Petitioner's intended use of McCoy's testimony was to impeach Claudia

10  and Suzy's testimony in the event that they denied being in a sexual relationship with one

11  another.  C.T.1 at 279–80.  In Nevada v. Jackson the Supreme Court unambiguously held

12  that "[the Supreme] Court has never held that the Confrontation Clause entitles a criminal

13  defendant to introduce extrinsic evidence for impeachment purposes."  133 S. Ct. at 1994

14  (emphasis original).  By contrast, the Court in Jackson noted that it is rare that the right to

15  present a complete defense is violated by the exclusion of defense evidence under a state rule

16  of evidence.  Jackson, 133 S. Ct. at 1992.  Rejecting a broader constitutional right to present

17  evidence bearing on witness credibility, the Court held that the Confrontation Clause is

18  generally satisfied by the defense's opportunity "expose [testimonial] infirmities through

19  cross-examination."  Id. at 1994 (citing Fensterer, 474 U.S. at 22).  Under Jackson, the trial

20  court's exclusion of Jeni McCoy's extrinsic impeachment testimony was not a violation of

21  Petitioner's constitutional rights.  See Jackson, 133 S. Ct. at 1994; see Doughton v. Foulk,

22  584 F. App'x 842, 842 (9th Cir. 2014).

23         Petitioner relies on precedent describing state evidentiary rules that violated a

24  defendant's due process right to present a full defense: Holmes v. South Carolina, 547 U.S.

25  319 (2006), Chambers v. Mississippi, 410 U.S. 284 (1973), and Washington v. Texas, 388

26  U.S. 14 (1967).  See Pet. at 23–24.  However, these cases are inapposite.  As noted in

27  Jackson, "only rarely [has the Supreme Court] held that the right to present a complete

28  defense was violated by the exclusion of defense evidence under a state rule of evidence."

133 S. Ct. at 1992.  As the Court in <u>Jackson</u> further noted, the Courts in <u>Holmes</u>, <u>Washington</u>, and <u>Chambers</u> all adjudicated rigid application of evidentiary rules which served either arbitrary or indiscernible purposes.  <u>Id.</u>  Here, the state court's decision was based on considered application of a "valid legislative determination that rape victims deserve heightened protection against surprise, harassment, and unnecessary invasions of privacy," as well as the likelihood of prejudice, confusion, and undue consumption of time. <u>See</u> <u>Lucas</u>, 500 U.S. at 150; <u>Manai</u>, 2010 WL 4621824 at *15–17.  Both the trial court and the court of appeal performed an appropriate balance of the probity of Petitioner's offered evidence and the protections mandated by the Rape-Shield statutes.  <u>Manai</u>, 2010 WL 4621824 at *15–17.

A district court, sitting in habeas review of a claim of exclusion of evidence, applies a balancing test similar to that for a claim a Confrontation Clause violation.  <u>See</u> <u>Miller v. Stagner</u>, 757 F.2d 988, 994 (9th Cir. 1985), <u>amended</u> 768 F.2d 1090.  In determining whether the excluded material is relevant, material, and vital to the defense, the court may consider factors including (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense.  <u>See</u> <u>United States v. Stever</u>, 603 F.3d 747, 755–56 (9th Cir. 2010) (quoting <u>Miller</u>, 757 F.2d at 994).  A court also must give due weight to the purpose and importance of the exclusionary rule, as well as consider how well that purpose applies to the case at hand.  <u>Miller</u>, 757 F.2d at 994–95.  Here, the state court found that the firm but indistinct impression formed by McCoy during her brief interaction with Suzy and Claudia was insufficiently probative when considered against section 752's protections for victims, as well as the possibility of confusion of the issues and undue consumption of time.  <u>Manai</u>, 2010 WL 4621824, at *17.  A constitutional violation occurs only where excluded evidence has "persuasive assurances of trustworthiness" and is "critical" to the defense.  <u>Chambers</u>, 410 U.S. at 302.  The exclusion of McCoy's testimony was a reasoned—not

1   arbitrary—decision, and it was proportionate to the purposes of the statute given that some

2   cross-examination of the complaining witnesses was allowed.

3       Given the foregoing, Petitioner fails to meet his burden of showing that the trial court

4   violated his Due Process rights.  Petitioner is not entitled to federal habeas relief on the claim

5   that the California Court of Appeal's upholding of the exclusion of Jeni McCoy's testimony

6   was an objectively unreasonable application of federal law.  See 28 U.S.C. § 2254(d);

7   Williams, 529 U.S. at 412–13.

8                   **c.       Harmless Error**

9       Furthermore, this Court is in agreement with the state court that even if the limitations

10  on cross-examination and testimony were unreasonable, any error would be harmless.  See

11  Manai 2010 WL 4621824, at *18–19 (holding that there is no reasonable probability that the

12  exclusion of the evidence had an effect on the verdict); see also Towery v. Schriro, 641 F.3d

13  300, 307 (9th Cir. 2010) (holding that a state court's harmless error analysis warrants

14  deference from a habeas court where the state court performed the same analysis required

15  under Supreme Court precedent and "neither the reasoning nor the result of the state-court

16  decision contradicts" that precedent (citing Early v. Packer, 537 U.S. 3, 8 (2002) (per

17  curiam)).  For the purposes of federal habeas corpus review, the standard applicable to

18  violations of the Confrontation Clause is whether the inadmissible evidence had an actual

19  and prejudicial effect upon the jury.  See Hernandez v. Small, 282 F.3d 1132, 1144 (9th Cir.

20  2002) (citing Brecht, 507 U.S. at 637 (1993)).  Likewise, a petitioner must show that

21  erroneously excluded evidence likely had a "substantial and injurious effect" on the verdict.

22  Depetris, 239 F.3d at 1063.

23      Establishing a sexual relationship would not have been exculpatory, and Petitioner

24  would still have been left in the position of convincing the jury to believe his story over that

25  of the complaining witnesses.  While a sexual relationship between Claudia and Suzy might

26  have more clearly provided a motive for Claudia to attack Petitioner, the jury did hear

27  evidence that the relationship between the victims was unusually close and more than just a

28  friendship.  Specifically, the jury heard that the two women saw each other most days, that

United States District Court
For the Northern District of California

both women had since separated from their partners and moved in together, and that they at least occasionally shared a bed. <u>Manai</u> 2010 WL 4621824, at *18. The jury also heard that Suzy invited Petitioner back to the apartment, while Claudia was reluctant to bring him back. <u>Id.</u> The jury thus heard some evidence providing support for Petitioner's defense that Claudia attacked him and the women had motive to create a story to cover that fact.[5] However, Petitioner's proffered evidence provided additional reason to believe Petitioner's version of Claudia's attack, in which Claudia silently observed him and Suzy for some time before joining them, voluntarily orally copulating him for some moments, and then biting and attacking him. <u>Id.</u> at *7.

This Court finds that the exclusion of the evidence did not have an actual, substantial injurious or prejudicial effect on the outcome of the trial in light of the abundant evidence corroborating the victims' account and contradicting the Petitioners. First, Petitioner testified that there was "great feeling" between him and Suzy; that she danced provocatively with him, massaged his shoulders at the apartment, and that her forwardness made him uncomfortable. <u>Id.</u> By contrast, Suzy testified that everyone was dancing, and that it was the Petitioner who was giving massages. R.T.3 at 633–34. Bobby Rivera, who witnessed the interaction in the apartment, confirmed Suzy's version of the events. R.T.4 at 1036–37. He

---

[5] While limiting the time allotted to cross-examination is often preferable to limiting the subject matter, <u>see</u> <u>Fenenbock</u>, 692 F.3d at 920 (time limit on duration of cross-examination of juvenile reasonable under Supreme Court's Confrontation Clause precedents); <u>Holley</u>, 568 F.3d at 1100 ("[T]he court could have limited the time allotted to discussion of the [objectionable topic], rather than excluding all discussion."), in this case a time limitation would not necessarily have satisfied the "heightened protection against surprise, harassment, and unnecessary invasion of privacy" required by the state's Rape-Shield statutes, <u>see</u> <u>Lucas</u>, 500 U.S. at 150. The trial court instead satisfied the time limit's purpose, i.e., allowing Petitioner to examine the "particular and relevant topic" of the women's motive to lie, by permitting examination of the relationship between the two women such that it would provide that motive. <u>See</u> <u>Fenenbock</u>, 692 F.3d at 919; <u>see also</u> <u>Wood</u>; 957 F.2d 1553 (no Confrontation Clause violation where the defendant was allowed to develop a record from which to argue his past sexual history with the complaining witness); <u>Bright v. Shimoda</u>, 819 F.2d 227, 229 (9th Cir. 1987) ("When substantial cross-examination has taken place, courts are less inclined to find confrontation clause violations."); <u>see generally</u> <u>Clark</u>, 331 F.3d at 1069 (holding that while circuit law may be persuasive authority for the purpose of determining whether a state court's decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings must be reasonably applied).

United States District Court
For the Northern District of California

1    further testified that Suzy was uncomfortable with Petitioner massaging her, and indicated to

2    him that she wished for help extricating herself from Petitioner's attention.  Id.

3         Second, the treating physician's assistant testified that both women suffered physical

4    injuries consistent with their account of the evening, photographs of which were shown to the

5    jury.  Manai, 2010 WL 4621824, at *5.  Specifically, Claudia suffered injuries—to her head,

6    jaw, back, knee, ribs, and hand—that were consistent with her description of being punched,

7    kicked, and dragged by Petitioner.  Id.  Suzy also suffered scratches to her neck, tenderness

8    on the back of her head, and fingerprint bruising and marks to her arms, that were consistent

9    with having a corkscrew at her throat and being dragged and punched by Petitioner.  Id.

10   Significantly, while Petitioner's version of events did include a fight with Claudia, it in no

11   way explained the injuries to Suzy, with whom he claimed not to have fought.  See id. at *7;

12   R.T.5 at 1363–65.

13        Third, the jury heard the propensity evidence of Petitioner's past French conviction

14   for rape.  Not only was this evidence suggestive of Petitioner's propensity to commit the type

15   of act he was accused of, but there were significant similarities between the crime accused

16   here and Veronique's testimony.  In both instances, Petitioner used a sharp weapon against

17   the women's throats to gain control of them.  R.T.3 at 647; R.T.5 at 1195.  In both instances,

18   Petitioner dragged the women from room to room.  R.T.3 at 652, 667; R.T.5 at 1207.  In both

19   instances, Petitioner told the women to "suck my dick," R.T.3 at 672; R.T.5 at 1205, and then

20   caressed their breasts and moaned while forcing the women to orally copulate him, R.T.3 at

21   671; R.T.5 at 1212–13.  In both instances, Petitioner forced the women not to look at him.

22   R.T.5 at 1203, 1211 (Petitioner placed a towel over Veronique's head); R.T.3 at 650

23   (Petitioner told Suzy not to look at him and punched her if she did).  And in both instances,

24   Petitioner verbally demeaned the women and their performance of his demanded acts.  R.T.3

25   at 667 (telling Suzy and Claudia to act like dogs); R.T.4 at 914 (telling Claudia to "do it

26   right"); R.T.5 at 1209; 1214 (telling Veronique that her performance "wasn't all that great"

27   and that French women "didn't really know how to do that").  Finally, in both instances,

28

United States District Court
For the Northern District of California

Petitioner attacked the women after consuming alcohol and drugs.  R.T.5 at 1348; R.T.6 at 1379.

Fourth, and most significantly, Claudia and Suzy called 911 immediately after Petitioner left the apartment at 2:03 a.m, a call which was played for the jury.  Manai, 2010 WL 4621824, at *4.  Suzy, who made the call, was heard repeatedly breaking down, having difficulty breathing, and asking that the police hurry because she feared for her life.  Id.  The responding officer testified that both women were very scared, crying, and hyperventilating when he arrived two minutes later.  Id.  The women fully cooperated with the investigation from that moment until 12:30 p.m. the following day.  Id. at *19 n.5.  During that time, the women were repeatedly separated and questioned, provided the police with a phone number by which to track down Petitioner, and returned to the police station two more times to assist with a police sketch and to identify Petitioner in a line-up.  Id. at *18 n.22; R.T.4 at 1057.  As the state court pointed out, the women's full cooperation with the police was more consistent with an honest report of a crime than with a hastily fabricated false report to cover a crime by one of them, which could fall apart on investigation.  See id. at *18.

By contrast, Petitioner did not come forward to the police until it was clear that the police had identified him.  Id. at *8.  On the night of the incident, Petitioner confirmed that he left Rivera and Fuentes outside the bar at 1:45 a.m., a time confirmed by Rivera.  Id. at *7; R.T.4 at 1034.  He testified that he got lost on the way to back to Claudia's apartment, taking at least 5–10 minutes.  R.T.5 at 1354.  He testified that Suzy invited him in, that they looked for his missing items and then that he and Suzy consensually kissed and caressed each other for 20–30 minutes, after which Suzy voluntarily performed oral sex on him for several minutes before he noticed Claudia in the room.  Id. at 1360–62; R.T.6 at 1397.  Petitioner testified that Claudia then approached him, took his penis from Suzy, and orally copulated him for several moments until she bit him and attacked him—an act which required the two women to contrive a cover story.  R.T.5 at 1363–64.  At this point, Petitioner testified that he had difficulty getting his clothes together, since he was fighting off Claudia, and it took him another 5 minutes to leave the apartment.  Id. at 1364–65.  The time frame required for

Petitioner's story, even considered conservatively, goes beyond the 911 call which was recorded at 2:03 a.m., and even beyond the arrival of the police at the apartment.  See Manai, 2010 WL 4621824, at *4.

In order for the jury to accept Petitioner's story, even assuming Petitioner successfully established a sexual relationship between the two women, the jury would have also been required to compress Petitioner's story into the available time and then credit: (1) that Suzy consented to orally copulate Petitioner; (2) that Claudia then attacked Petitioner in the manner he described; (3) that in a matter of moments, the two women agreed to cover for Claudia's crime; (4) that they fabricated a story; (5) that Suzy called 911 crying and hyperventilating; and (6) that the two women successfully faked their terror to the first responders and consistently told a fictional story which withstood multiple, individual questionings by the police over the next ten hours.  In the context of the significant evidence heard by the jury confirming Suzy and Claudia's story and Petitioner's demonstrated disposition to commit an offense similar to the one he was accused of, Petitioner's proffered evidence had limited probity and did little to confirm his own story.  Even if the state court had erred constitutionally in refusing its admission, that error would not have resulted in actual prejudice and would have been harmless.  See Brecht, 507 U.S. at 637.  Under the standard of § 2254(d), Petitioner is not entitled to habeas relief on his claim that the trial court violated his Confrontation Clause and Due Process rights.  See 28 U.S.C. § 2254(d).

### 2.      Right to an Impartial Jury

Petitioner next claims that the trial court's refusal to replace Juror no. 12 during trial violated his Sixth Amendment and Due Process right to a fair trial with an impartial jury. Pet. at 35.  During the trial, Juror no. 12 came forward to tell the court that, during voir dire, he had forgotten to disclose that he had been a witness to a crime. R.T.2 at 751–52.  The trial court questioned the juror and held that the omission was inadvertent, and that there was no demonstration of bias. R.T.6 at 1421.  The Court of Appeal affirmed in a reasoned decision. Manai, 2010 WL 4621824, at *25.  Petitioner does not challenge the Court of Appeal's affirmation that the omission during voir dire was inadvertent.  Instead, Petitioner argues that

United States District Court
For the Northern District of California

the state court's ruling upholding the trial court's finding that Juror no. 12 was not actually biased was based on an unreasonable determination of the facts. Pet. at 50; see 28 U.S.C. § 2254(d)(2). However, Petitioner has not shown that the state court's decision was unreasonable in light of the evidence in the record, and the claim is without merit. See Miller-El, 537 U.S. at 340.

### a.    Background

During a break in Suzy's cross-examination, Juror no. 12 asked to meet with the court in camera to report that he had witnessed a mugging in San Francisco at the same time of year and that he had forgotten to report it during voir dire. R.T.2 at 751–52. Concerned that he was "subconsciously drawing connections" between the incidents that Suzy had recounted and what he had witnessed, he asked the court if it would be possible to get the police report of the incident in order to learn the date and confirm that it could not have been committed by Petitioner. Id. at 752–53. In response to the court's questions, the juror revealed that he had thought of the incident only upon learning that Petitioner had met the complaining witnesses in a bar, which he thought might have been similar to the incident he witnessed. Id. at 753–54. As to the mugging itself, Juror no. 12 had seen only a man in dark clothing running away from him, and said he had no indication or reason to believe that he had seen Petitioner. Id. Still, he wished to dispel any subconscious connection. Id. Juror no. 12 indicated that, despite his subconscious, he had no trouble following the testimony and would be able to keep the instances separate. Id. at 755. The court reminded Juror no. 12 of his duties to solely consider the evidence put forward at trial; Juror no. 12 responded that he would be able to make a judgment solely on the evidence presented and that his past experience would not interfere with the deliberation process. Id. at 755–56.

The trial judge reserved the issue for motion by the parties, but indicated that she considered Juror no. 12 to be "articulate enough to know that he can't properly consider it for any reason at all" and that she felt that he had brought it before the court "in an overabundance of caution, in wanting to do a good job as a juror." Id. at 757–58.

United States District Court
For the Northern District of California

After both sides completed their cases in chief, defense counsel filed a motion to remove Juror no. 12 for cause, arguing that he had either committed perjury by failing to respond affirmatively to <u>voir dire</u> questions about whether he had been a witness to a crime, or was inattentive.  C.T.2 at 425.  The court found that, based on the inquiry performed when Juror no. 12 came forward, the omission had been inadvertent; that he had simply forgotten and then been reminded on the morning of Suzy's testimony.  R.T.6 at 1418–19.  The court further found that Juror no. 12 was candid and credible, as well as slightly embarrassed that he had not remembered his experience earlier, and that he made an effort to inform the court as soon as he remembered the incident.  <u>Id.</u> at 1419–20.  The court noted that Juror no. 12 had asked to see a police report to confirm that the incident bore no relation to the defendant. <u>Id.</u> at 1420–21.  But the court then found that, when asked if he would be able to decide the case based only on the evidence, Juror no. 12 was clear that he would be able to do so and would not allow his memory of the incident to interfere with his performance as a juror.  <u>Id.</u> The court held that there was no showing of bias and no cause to dismiss Juror no. 12, and so denied the motion.  <u>Id.</u> at 1421.

### b.    Analysis

The Sixth Amendment guarantees a criminal defendant a fair trial by a panel of impartial jurors.  U.S. Const. amend. VI; <u>see</u> <u>Irvin v. Dowd</u>, 366 U.S. 717, 722 (1961). "Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury."  <u>Tinsley v. Borg</u>, 895 F.2d 520, 523–24 (9th Cir. 1990) (internal quotation marks omitted).  However, the Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation."  <u>Smith v. Phillips</u>, 455 U.S. 209, 217 (1982).  The safeguards of juror impartiality, such as <u>voir dire</u> and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.  <u>Id.</u> Due process only means a jury capable and willing to decide the case solely on the evidence before it and a trial judge ever watchful to prevent prejudicial occurrences and to determine

1    the effect of such occurrences when they happen.  Id.  Such determinations may properly be

2    made at a hearing.  Id.

3          Here, the California Court of Appeal rejected Petitioner's claim as follows:

4    **[]Legal Standards**
     A criminal defendant has a federal and state constitutional right to a trial by impartial
5    jurors.  (In re Hitchings (1993) 6 Cal.4th 97, 110.)  "A juror who conceals relevant
     facts or gives false answers during the voir dire examination . . . undermines the jury
6    selection process and commits misconduct."  (Id. at p. 111.)  Further, a juror who
     considers material extraneous to the record also commits misconduct.  (People v.
7    Williams (2006) 40 Cal.4th 287, 333.)

8    "On appeal from a ruling denying a new trial motion based on juror misconduct, we
     defer to the trial court's factual findings if supported by substantial evidence, and
9    exercise our independent judgment on the issue of whether prejudice arose from the
     misconduct. . . .  (People v. Nesler [ (1997) ] 16 Cal.4th [561,] 582 & fn. 5; see
10   People v. Ault (2004) 33 Cal.4th 1250, 1263–1264.)"  (People v. Cissna (2010) 182
     Cal.App.4th 1105, 1117.)

11
     **[]Juror Misconduct and Prejudice**
12   Based on its own interrogation of the juror, including its assessment of the juror's
     demeanor, the trial court found that the juror had not committed perjury and that his
13   failure to respond to the court's general question to the panel was inadvertent.
     Defense counsel himself did not challenge the juror's credibility saying "He appears
14   to be a very honest gentleman to me, and I really believe that he is going to try to do
     what he says."  Substantial evidence supports the trial court's finding that no
15   prejudicial misconduct occurred.

16   Even if we were to find misconduct in the juror's inadvertent failure to affirmatively
     respond to the court's question, we would concur with the court's conclusion that no
17   bias or prejudice had been shown.  "Misconduct by a juror [ ] . . . usually raises a
     rebuttable 'presumption' of prejudice.  [Citations.] . . . [¶] . . . Any presumption of
18   prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the
     particular case, including the nature of the misconduct or other event, and the
19   surrounding circumstances, indicates there is no reasonable probability of prejudice,
     i.e., no substantial likelihood that one or more jurors were actually biased against the
20   defendant.  [Citations.]"  (In re Hamilton (1999) 20 Cal.4th 273, 295–296.)  The
     prejudice standard "is a pragmatic one, mindful of the 'day-to-day realities of
21   courtroom life' [citation] and of society's strong competing interest in the stability of
     criminal verdicts [citations].  It is 'virtually impossible to shield jurors from every
22   contact or influence that might theoretically affect their vote.'  [Citation.]  Moreover,
     the jury is a 'fundamentally human' institution; the unavoidable fact that jurors bring
23   diverse backgrounds, philosophies, and personalities into the jury room is both the
     strength and the weakness of the institution.  [Citation.]  '[T]he criminal justice
24   system must not be rendered impotent in quest of an ever-elusive perfection. . . .
     [Jurors] are imbued with human frailties as well as virtues.  If the system is to
25   function at all, we must tolerate a certain amount of imperfection short of actual
     bias.'  [Citation.]"  (Id. at p. 296.)

26
     Any presumption of prejudice that might have arisen was more than adequately
27   rebutted by evidence that Juror No. 12 held no actual bias against [Petitioner].  Juror
     No. 12 voluntarily came forward, described the crime he had witnessed, and
28   expressed his own independent concern that the information might be subconsciously
     prejudicing him against [Petitioner].  These objective circumstances strongly suggest

the juror did not intentionally conceal his memory of the incident during voir dire, and that he had a sincere commitment to following the court's instructions and performing his duties in an unbiased manner. When the court told him he needed to set aside the prior incident and decide the case solely based on the evidence presented at trial without obtaining outside information, he readily agreed and assured the court that he could do so. Even defense counsel acknowledged that the juror seemed honest and sincere.

[Petitioner] suggests it was not reasonably possible for the juror to set aside his memory of the incident given the incident's similarity to [Petitioner's] alleged crime. In our view, there was nothing extraordinary about the crime Juror No. 12 witnessed or its similarity to the charged crimes. Jurors routinely are asked to set aside similar experiences and, through intellectual self-discipline and a commitment to a fair judicial process, decide the case according to the evidence presented at trial and the court's instructions. In light of the court's credibility determinations, the objective circumstances in which the report came to light (i.e., through the juror's own conscientious self-reporting), and the juror's lack of any information actually linking [Petitioner] to the crime he witnessed, we conclude no evidence of prejudice was presented, and any inference of prejudice was more than adequately rebutted. The record does not establish any substantial likelihood that Juror No. 12 was biased and his removal from the jury was required.

<u>Manai</u>, 2010 WL 4621824, at *24–25 (footnotes omitted).

Petitioner presents this Court with no new evidence to suggest that Juror no. 12 was actually biased. Instead, Petitioner argues that the state court's decision was unreasonable on the evidence before it. "[T]he question on review," therefore "is whether an appellate panel, applying the normal standards of appellate review, could reasonably conclude that the finding is supported by the record." <u>Lambert v. Blodgett</u>, 393 F.3d 943, 978 (9th Cir. 2004). In reviewing the state court's findings based solely on the record, the Ninth Circuit has directed that a habeas court must be "particularly deferential to our state court colleagues." <u>Id.</u> at 972. The question is therefore not only whether an appellate court could reasonably conclude that the finding is supported; to grant relief, the court must be satisfied that "<u>any</u> appellate court to whom the defect [in the state court's fact-finding process] is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." <u>Id.</u> (emphasis original) (citations omitted).

Here, Petitioner argues that Juror no. 12's own self-reporting demonstrated that he was unable to follow the court's jury instructions and was therefore incapable of deciding the case solely on the evidence presented at trial. Petitioner argues that because Juror no. 12 hoped that the court could confirm for him, via police reports or some other extrinsic

37

**United States District Court**
For the Northern District of California

1    evidence, that the crime he had witnessed was not related to the case before the court, he

2    demonstrated that he lacked the "intellectual self-discipline" to follow the jury's instruction

3    to consider only the evidence presented at trial.  Pet. at 45 (citing Manai, 2010 WL 4621824,

4    at *25).  By Petitioner's reasoning, this evidence demonstrates that the state court was

5    unreasonable when it confirmed the trial court's finding that Juror no. 12 was not actually

6    biased, since he had once shown an inability to follow the court's direction to consider only

7    the evidence presented.

8         The Ninth Circuit defines actual bias as "a state of mind that leads to an inference that

9    the person will not act with entire impartiality."  Fields v. Brown, 503 F.3d 755, 767 (9th Cir.

10   2007) (quotations omitted).  Actual bias is typically found where a juror "states that he can

11   not be impartial, or expresses a view adverse to one party's position and responds

12   equivocally as to whether he could be fair and impartial despite that view."  Id.  Assessment

13   of that bias is "essentially one of credibility, and therefore largely one of demeanor."  Patton

14   v. Yount, 467 U.S. 1025, 1038 (1984); see Smith v. Swarthout, 742 F.3d 885, 893 (9th Cir.

15   2014).  Even where a juror displays some knowledge of the facts or issues of a case, that

16   juror's knowledge is not at issue, but the juror's ability to "lay aside his impressions or

17   opinion and render a verdict based on the evidence presented in court."  Hayes, 632 F.3d at

18   511 (citing Patton, 467 U.S. at 1037 n.12).  The trial court, being in the best position to assess

19   a juror's demeanor and credibility, is entitled to "special deference" in making the

20   determination of the juror's ability to do so.  Patton, 467 U.S. at 1038; Smith, 742 F.3d at

21   893.

22        Here, Juror no. 12 voluntarily came to the court with an issue that he was concerned

23   might subconsciously impact his decision making.  R.T.2 at 751–52.  In response to

24   questioning by the court, the juror revealed that there was little, if anything, to connect the

25   crime that he had witnessed with the case at hand.  Id. at 753–54.  The court then reminded

26   Juror no. 12 that he could not consider anything other than the evidence presented in court

27   and asked if he would be able to do so.  Id. at 755.  Juror no. 12 responded clearly that he

28   would be able to keep the instances separate and would deliberate solely based on the

United States District Court
For the Northern District of California

1    evidence presented by the parties. Id.; R.T.6 at 1420. The juror expressed that "his

2    subconscious had made itself heard, and he had told it to shut up." R.T.6 at 1420. The trial

3    court found Juror no. 12 to be articulate enough to understand what he could not consider,

4    and credible in his desire to do a good job as a juror. See id. at 757–58. As a result, the trial

5    court concluded that there was no demonstration of actual bias by Juror no. 12. R.T.6 at

6    1421.

7         Petitioner's argument that Juror no. 12 lacked the capacity to be unbiased is

8    insufficient to overcome the presumption that the trial court's factual finding is correct. See

9    Miller-El, 537 U.S. at 340. Nothing in the record suggests that the trial court's assessment of

10   Juror no. 12's credibility and competency was unreasonable. See Patton, 467 U.S. at 1037

11   n.12 ("[The] manner of the juror while testifying is oftentimes more indicative of the real

12   character of his opinion . . . but cannot always be spread upon the record. Care should,

13   therefore, be taken in the reviewing court not to reverse the ruling below upon such a

14   question of fact, except in a clear case.") (citing Reynolds v. United States, 98 U.S. 145, 156

15   (1879)). Accordingly, the California Court of Appeal's decision was not "based on an

16   unreasonable determination of the facts in light of the evidence presented during the State

17   court proceedings." See 28 U.S.C. § 2254(d)(2). Petitioner is not entitled to federal habeas

18   relief on the claim that the trial court violated his right to an impartial jury. See 28 U.S.C.

19   § 2254(d).

20        **3.      Propensity Evidence**

21        Petitioner also claims that the trial court violated his due process right to a fair trial by

22   admitting propensity evidence of his prior conviction for sexual assault. Pet. at 46.

23   Petitioner specifically argues that the evidence, the testimony of his prior victim Veronique,

24   was unduly prejudicial and that the state court's rejection of his due process claim regarding

25   its admission was based on an unreasonable application of facts. Id. at 50; see 26 U.S.C. §

26   2254(d)(2). Petitioner's claim is without merit.

27        The Supreme Court has expressly reserved the question of whether the use of prior

28   offenses to show a defendant's propensity to commit a charged crime can violate due

United States District Court
For the Northern District of California

process.  Estelle, 502 U.S. at 75 n.5.  Because of the Court's express reservation of the issue, habeas relief does not lie in a state court's admission of propensity evidence under state evidence laws—that admission cannot be contrary to, or an unreasonable application of, clearly established federal law.  Mejia v. Garcia, 534 F.3d 1036, 1046 (9th Cir. 2008); cf. United States v. LeMay, 260 F.3d 1018 (9th Cir. 2001) (upholding the use of propensity evidence of defendant's prior conviction for child molestation under Federal Rule of Evidence 414 against due process challenge).

Likewise, "it is not the province of a federal habeas court to reexamine state-court determinations on state law questions" such as balancing of the probity and prejudice of evidence under state standards.  Estelle, 502 U.S. at 67–68.  A habeas petitioner may argue a due process violation where the record demonstrates "errors that undermine confidence in the fundamental fairness of the state adjudication" that would "justify the issuance of the federal writ."  Williams, 529 U.S. at 375; see Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995).  However the Supreme Court "has made very few rulings regarding the admission of evidence as a violation of due process. . . . [I]t has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ."  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).

Here, the California Court of Appeal rejected Petitioner's claim as follows:

> Ordinarily, evidence that a defendant committed an uncharged crime or wrongful act is inadmissible to prove that person's propensity to commit such an act.  (See Evid.Code, § 1101, subd. (a).)  Section 1108 relaxes the rule in sex offense cases:  "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."  (§ 1108, subd. (a).)  The statute does not violate the due process guarantees of the federal and California constitutions because of its safeguards that the defendant must receive pretrial notice of the prosecution's intent to use such evidence and the evidence must be admissible under section 352.  (People v. Falsetta (1999) 21 Cal.4th 903, 915–917.)

> "[T]he Legislature's principal justification for adopting section 1108 was a practical one:  By their very nature, sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating evidence.  The ensuing trial often presents conflicting versions of the event and requires the trier of fact to make difficult credibility determinations. . . . [¶] . . . [E]vidence that [a defendant] committed other sex offenses is at least circumstantially relevant to the issue of his disposition or propensity to commit these offenses. . . . 'Such evidence "is [deemed] objectionable, not because it has no appreciable probative value, but because it has too much." . . .

[Citations.]' [Citations.]"  (Falsetta, supra, 21 Cal .4th at p. 915.)

Under section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  When determining whether to admit evidence of a prior sex offense under sections 1108 and 352, the trial court "must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense."  (Falsetta, supra, 21 Cal.4th at p. 917.)  The trial court enjoys broad discretion in determining whether to admit such evidence under section 352 and its exercise of discretion must not be disturbed on appeal unless arbitrary, capricious, or patently absurd and resulting in a manifest miscarriage of justice.  (People v. Rodrigues (1994) 8 Cal.4th 1060, 1124.)

We agree with the trial court's analysis of the offered evidence.  As noted, [Petitioner] objected to the admission of Veronique's testimony because of the alleged dissimilarity of the crimes.  It is true that similarity between sexual crimes increases the probative value of prior sexual offense evidence.  (People v. Lewis (2009) 46 Cal.4th 1255, 1287.)  However, strict similarity is not required and is not essential to the relevance and probative value of the evidence, as it might be when evidence is admitted under Evidence Code section 1101, subdivision (b) to prove, for example, a common design or plan.  (See People v. Frazier (2001) 89 Cal.App.4th 30, 40–41 [contrasting similarity requirement for admission of evidence under Evid. Code, §§ 1101, subd. (b), and 1108]; People v. Britt (2002) 104 Cal.App.4th 500, 505–506 [same].

As the trial court found, there were substantial similarities between the crimes.  Both incidents took place inside the victims' homes.  In both crimes, [Petitioner] first gained control over the victim by holding a sharp instrument to her neck, while wrapping his other arm around her neck and shoulder area.  In both, he expressly or impliedly threatened to harm the victims if they did not cooperate.  He repeatedly told the victims in both incidents not to look at him and he took steps to keep them from looking at him (by wearing glasses and putting a towel over Veronique's head, and by hitting Suzy and Claudia repeatedly to make them look away).  In both, he moved the victims around roughly by grabbing their hair or clothes and partially dragging them.  In both, he ordered the victims to orally copulate him while they were on their knees and he fondled their breasts while moaning.  He also commented on the quality of both Veronique's and Suzy's sexual performance.  There were, of course, differences between the incidents.  Most notably, in the Paris incident, [Petitioner] worked with an accomplice, he forced his way into the victim's apartment, he searched the apartment and stole many of the victim's belongings, the victim was a stranger before the attack began, he did not ask her to act like a dog, and he did not force her to undress.  However, as noted, strict similarity is not required.  Considering each incident in its entirety, the trial court reasonably concluded the similarities were substantial and thus the probative value of the evidence was strong.

[Petitioner] notes that the French crime occurred almost 10 years before the San Francisco incident, implying that the lapse in time reduced the probative value of the evidence.  However, [Petitioner] received an eight-year sentence for the crime and he testified, "I served my sentence in two parts.  In total, I spent four years in a detention center...."  He did not say when he was most recently released from custody.  We

agree with the trial court that the crime was not so remote in time as to lessen its probative value to a point that the evidence should have been excluded.

[Petitioner] argues that the facts of the French crime were more inflammatory than the current crime and thus likely to cause undue prejudice.  He cites the fact that the Paris crime took place in the context of a home invasion robbery and that he forced Veronique to lick his anus and then demeaned her performance.  However, certain facts of the San Francisco crime were more inflammatory than the French one: [Petitioner] took advantage of trust he had engendered in the victims by socializing with them; he used much greater violence than was reported by Veronique (hitting Suzy and Claudia repeatedly on the head, kicking Claudia in the ribs, and dragging the victims from room to room by the hair); and the sexual assault went through several stages, appeared to be escalating, and showed no signs of abating before Claudia interrupted it by biting [Petitioner's] penis.

Finally, [Petitioner] argues the jury might have been tempted to convict him of the San Francisco crime as punishment for the Paris incident because, while the jury heard that [Petitioner] was punished for the sexual crime against Veronique, it did not hear that [Petitioner] was ever punished for the burglary of Veronique's home.  It is unlikely the jury parsed the evidence of [Petitioner's] conviction so finely or that they focused on the Paris burglary as distinct from the sexual offense.  As noted by the trial court, evidence of [Petitioner's] conviction for the Paris incident both enhanced the probative value of the evidence (because it increased the certainty that he committed the crime), and reduced the danger that the jury would convict him of the charged San Francisco crimes in order to punish him for the Paris ones.  The conviction also mitigated the danger that it would be an undue burden on [Petitioner] to defend against evidence of the prior sexual offense, as it appears he had a full opportunity to defend himself during the French judicial proceedings.

Admission of evidence of the Paris crime in the circumstances of this case served the legislative intent of section 1108.  This case, like most sexual assault prosecutions, came down to a credibility contest between the defendant and the complaining witnesses.   There were no other eyewitnesses to the incident and the physical evidence was limited.  Evidence that [Petitioner] had committed a prior sexual offense with many similarities to the charged crimes assisted the jury in resolving this credibility contest by providing them with highly probative evidence about [Petitioner's] propensity to commit such crimes.  The trial court did not abuse its discretion in admitting the evidence.  Nor has [Petitioner] established a violation of his federal due process rights, which requires a showing that admission of the evidence rendered the trial fundamentally unfair.  (Estelle v. McGuire (1991) 502 U.S. 62, 70, 75 (McGuire).)

Manai, 2010 WL 4621824, at *11–13 (footnotes omitted).

As he did on state appeal, Petitioner argues before this Court that Veronique's testimony was so inflammatory that it was likely to cause undue prejudice and invited the jury to convict Petitioner for his past crime.  The California Court of Appeal rejected these arguments after a thorough review of the record and Petitioner fails to establish that the state court's determination was unreasonable in light of the record.  See Miller-El, 537 U.S. at 340.

United States District Court
For the Northern District of California

1    As the state court noted, Veronique recounted details that were no more inflammatory

2    than those before the trial court here.  See <u>Manai</u>, 2010 2010 WL 4621824, at *13; <u>see also</u>

3    <u>Payne v. Tennessee</u>, 501 U.S. 808, 831–32 (O'Connor, J., concurring) (finding that a victim

4    impact statement was not unduly inflammatory where it was no more inflammatory than the

5    details of the charged crime and its introduction was therefore not a violation of the

6    defendant's due process).  While Petitioner argues that assaulting Veronique during a home

7    invasion was likely to evoke a visceral reaction from most jurors, a reasonable court could

8    find that entering a victim's home by gaining and using that victim's trust would evoke an

9    equal reaction in most jurors.  See <u>Lambert</u>, 393 F.3d at 978 (holding that a habeas court

10   reviews a state court's factual determination under § 2554(d)(2) deferentially and grants writ

11   only if any appellate court would be unreasonable to uphold the state court's finding based

12   on the evidence in record).

13   Similarly, Petitioner contends that "any juror would have found repugnant

14   [Veronique's testimony about] [P]etitioner's comments demeaning his victim's coerced

15   sexual acts," including Petitioner's forcing Veronique to orally copulate him and lick his

16   anus. Pet. at 51.  A reasonable court could again find the demeaning comments Petitioner

17   made to Veronique to be no more inflammatory than Suzy and Claudia's description of

18   Petitioner's comments here.  And a reasonable court could further find that the violence

19   Petitioner used here, along with the multiple victims and the escalation of the crime before it

20   was interrupted, were actually more inflammatory than Petitioner's past crime.  See <u>Lambert</u>,

21   393 F.3d at 978.

22   Finally, Petitioner argues that the jury would have been outraged to learn that

23   Petitioner was sentenced to only eight years for his prior crime and served only four.  Pet. at

24   51.  Petitioner reasons that this was an invitation for the jury to convict him for his prior

25   crime.  <u>Id.</u>  However, the jury was given a limiting instruction as to the proper use of the

26   propensity evidence in the context of the case in front of them, and is presumed to have used

27   the evidence solely for the purpose for which it was admitted.  See <u>Aguilar v. Alexander</u>, 125

28   F.3d 815, 820 (9th Cir. 1997).  Petitioner's speculation does not demonstrate that the state

United States District Court
For the Northern District of California

1   court was unreasonable in determining that the jury would not parse the French conviction so

2   finely.  Nor does it demonstrate that the state court was unreasonable in determining that

3   evidence that Petitioner had actually been convicted and served a custodial sentence would

4   reduce the danger that the jury would wish to punish him for his past crimes.  See Lambert,

5   393 F.3d at 978; cf. Dowling v. United States, 493 U.S. 342, 353 (1990) (holding that the

6   introduction of evidence of a past crime, for which the defendant was acquitted and received

7   no punishment, as identity evidence did not violate the defendant's due process rights).

8       Petitioner has simply not shown that the state court's determination that Veronique's

9   propensity testimony was not unduly inflammatory was unreasonable in light of the evidence

10  in the record.  See 28 U.S.C. § 2254(d)(2); Miller-El, 537 U.S. at 340.  While the Supreme

11  Court has made few rulings regarding the admission of evidence as a violation of due

12  process, Holley, 568 F.3d at 1101, the Court has been clear that "the category of infractions

13  that violate 'fundamental fairness' [is] very narrow[]," see Estelle, 502 U.S. at 73 (citing

14  Dowling, 493 U.S. at 352); Hayes, 632 F.3d at 515.  "Beyond the specific guarantees

15  enumerated in the Bill of Rights, the Due Process Clause has limited operation."  Estelle, 502

16  U.S. at 73; see Hayes, 632 F.3d at 515.  Propensity evidence "will only sometimes violate the

17  constitutional right to a fair trial, if it is of no relevance, or if its potential for prejudice far

18  outweighs what little relevance it might have."  LeMay, 260 F.3d at 1027.

19      Here, Petitioner's prior conviction for a similar act was undoubtedly relevant to his

20  credibility and propensity to commit a similar crime.  See, e.g., Mejia, 534 F.3d at 1046

21  ("[A]dmission of propensity evidence . . . to lend credibility to a sex victim's allegations . . .

22  [is] indisputably relevant to the crimes charged."); Boyde v. Brown, 404 F.3d 1159, 1172

23  (9th Cir. 2005) (constitutionally permissible to introduce evidence of past crimes to show that

24  at-issue crime shared characteristics with defendant's prior criminal acts); Colley v. Sumner,

25  784 F.2d 984, 990 (9th Cir. 1986) (testimony that petitioner had previously sexually

26  assaulted a woman in a similar manner suggested that petitioner had a unique modus

27  operandi, which "was relevant to prove both intent and identity issues that [petitioner] raised

28

44

by his 'not guilty' plea.''); see also LeMay, 260 F.3d at 1028-29 (trial court's admission of sexual propensity evidence did not violate due process or render trial fundamentally unfair).

Petitioner has failed to meet the "heavy burden in showing a due process violation based on an evidentiary decision." See Boyde, 404 F.3d at 1172. Petitioner has similarly failed to demonstrate that the state court's determinations were unreasonable in light of the evidence presented. See 28 U.S.C § 2254(d)(2); Miller-El, 537 U.S. at 340. Petitioner is not entitled to federal habeas relief on his claim that the use of propensity evidence was unduly inflammatory and violated his due process rights. See 28 U.S.C § 2254(d).

### 4.    Cumulative Error

Lastly, Petitioner claims that even if each of the above discussed claims do not merit reversal of his conviction individually, taken together the evidentiary and instructional claims rendered his trial fundamentally unfair. Pet. at 53. Petitioner's claim is without merit.

The Ninth Circuit has held that, in exceptional cases, while no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several trial errors may prejudice a defendant so much that his conviction must be overturned. See Alcala v. Woodford, 334 F.3d 862, 893-95 (9th Cir. 2003). This is not such an exceptional case.

Cumulative error violates due process principles and warrants habeas relief only "where the errors have 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). Furthermore, cumulative error applies only where no single error is sufficiently prejudicial but the effect of multiple errors compound the impact. See Alcala, 334 F.3d at 893–95. Therefore where, as here, "there is no single constitutional error . . ., there is nothing to accumulate to a level of constitutional violation." See Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002); Hayes, 632 F.3d at 525 (holding that where no error reaches constitutional magnitude on habeas review, no cumulative error is possible). Petitioner's claim that cumulative error requires reversal of his conviction is without merit.

//

## V.    CONCLUSION

After a careful review of the record and pertinent law, the Court is satisfied that the petition for a writ of habeas corpus must be DENIED.

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, a certificate of appealability (COA) under 28 U.S.C. § 2253(c) also is DENIED because petitioner has not demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

The clerk shall enter judgment in favor of Respondent and close the file.

**IT IS SO ORDERED.**

Dated: May 1, 2015

_____
CHARLES  R. BREYER
United States District Judge